## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| In re: | Chapter 15 |
|---|---|
| BRON Creative USA, Corp. | Case No. 23-56799 |
| BRON Digital USA, LLC | Case No. 23-56801 |
| BRON Life USA Inc.  f/k/a BRON Legacy USA Inc. | Case No. 23-56802 |
| BRON Media Holdings USA Corp. | Case No. 23-56798 |
| BRON Releasing USA Inc. | Case No. 23-56803 |
| BRON Studios USA Inc. | Case No. 23-56804 |
| BRON Ventures 1, LLC | Case No. 23-56806 |
| BRON Studios USA Developments Inc. | Case No. 23- 56805 |
| Bakhorma, LLC | Case No. 23-56807 |
| Drunk Parents, LLC | Case No. 23-56808 |
| Fables Holdings USA, LLC | Case No. 23-56809 |
| Fables Productions USA Inc | Case No. 23-56810 |
| Gossamer Holdings USA, LLC | Case No. 23-56811 |
| Gossamer Productions USA Inc. | Case No. 23-56812 |
| Harry Haft Productions, Inc. | Case No. 23-56813 |
| Heavyweight Holdings, LLC f/k/a Harry Haft Films, LLC | Case No. 23-56815 |
| I Am Pink Productions, LLC | Case No. 23-56817 |
| Lucite Desk, LLC | Case No. 23-56818 |
| National Anthem Holdings, LLC f/k/a BCDC Holdings, LLC | Case No. 23-56819 |
| National Anthem ProdCo Inc. | Case No. 23-56820 |
| Oakland Pictures Holdings, LLC | Case No. 23-56821 |
| Pathway Productions, LLC | Case No. 23-56823 |
| Robin Hood Digital PC USA Inc. | Case No. 23-56824 |
| Robin Hood Digital USA, LLC | Case No. 23-56825 |
| Solitary Holdings USA, LLC | Case No. 23-56826 |
| Surrounded Holdings USA LLC | Case No. 23-56827 |
| Welcome To Me, LLC | Case No. 23-56828 |
| **Debtors in a Foreign Proceeding.** | **Joint Administration Requested.** |

## NOTICE OF FILING OF
## (I) CERTIFIED COPY OF INITIAL ORDER MADE AFTER
## APPLICATION AND (II) DECLARATION OF AARON L. GILBERT
## IN SUPPORT OF THE DEBTORS' CHAPTER 15 PETITIONS AND FIRST-DAY
## PLEADINGS IN FOREIGN PROCEEDINGS

BRON Media Corp., in its capacity as the Canadian Court-appointed and authorized foreign representative (the "Foreign Representative") for the above-captioned debtors (collectively, the "Debtors") which are the subjects of a reorganization proceeding (the "CCAA Proceeding") commenced before the Supreme Court of British Columbia (the "Canadian Court") under Canada's *Companies' Creditors Arrangement Act*, hereby files this (i) certified copy of the *Order Made After Application* in the case styled *In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, As Amended and In the Matter of the Business Corporations Act, S.B.C. 2002, c. 57, As Amended and the Business Corporations Act, R.S.O. 1990, C. B. 16, As Amended and In the Matter of a Plan or Compromise or Arrangement of Bron Media Cop. And the Entities Listed on Schedule "A"* attached hereto as Exhibit "A", and (ii) *Declaration of Aaron Gilbert in Support of the Debtors' Chapter 15 Petitions and First Day Pleadings in Foreign Proceeding* attached hereto as Exhibit "B".

Dated: July 20, 2023.                                JONES & WALDEN LLC

*/s/ Cameron M. McCord*
Cameron McCord
Georgia Bar No. 143065
Mark Gensburg
Georgia Bar No. 213119
Attorneys for Debtors
699 Piedmont Ave NE
Atlanta, Georgia 30308
(678) 701-9235
cmccord@joneswalden.com
mgensburg@joneswalden.com
*Counsel for Debtors and Foreign Representatives*

## EXHIBIT A

***Order Made After Application***



**No. S-235084**
**Vancouver Registry**

## IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED
AND
IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*,
S.B.C. 2002, c. 57, AS AMENDED AND THE BUSINESS CORPORATIONS ACT, R.S.O.
1990, C. B.16, AS AMENDED
AND
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
BRON MEDIA CORP. AND THE ENTITIES LISTED AT SCHEDULE "A"
PETITIONERS

### PETITIONERS

### O R D E R MADE AFTER APPLICATION

| | |
|---|---|
| BEFORE THE HONOURABLE | ) |
| | ) 19/07/2023 |
| JUSTICE GOMERY | ) |

THE APPLICATION of the Petitioners coming on for hearing at Vancouver, British Columbia, on the 19th day of July, 2023 (the "**Order Date**"); AND ON HEARING Asim Iqbal and Bryan Hicks, counsel for the Petitioners and those other counsel listed on Schedule "C" hereto; AND UPON READING the material filed, including the First Affidavit of Aaron Gilbert sworn July 18, 2023 (the "**Gilbert Affidavit**") and the consent of Grant Thornton Limited to act as Monitor (in such capacity, the "**Monitor**");

AND UPON BEING ADVISED that the secured creditors who are likely to be affected by the charges created herein were given notice; AND pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36 as amended (the "**CCAA**"), the British Columbia Supreme Court Civil Rules and the inherent jurisdiction of this Honourable Court;

70855982.8

## THIS COURT ORDERS AND DECLARES THAT:

### JURISDICTION

1.      The Petitioners are companies to which the CCAA applies.

### SUBSEQUENT HEARING DATE

2.      The hearing of the Petitioners' application for an extension of the Stay Period (as defined in paragraph 15 of this Order) and for any ancillary relief shall be held at the Courthouse at 800 Smithe Street, Vancouver, British Columbia at 9:00 a.m. on Thursday, the 27th day of July, 2023 for one hour and continuing at 9:00 a.m. on Friday, the 28th day of July, 2023 for one hour, or such other date as this Court may order.

### PLAN OF ARRANGEMENT

3.      The Petitioners shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "**Plan**").

### POSSESSION OF PROPERTY AND OPERATIONS

4.      Subject to this Order and any further Order of this Court, the Petitioners shall remain in possession and control of their current and future assets, licences, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"), and continue to carry on their business (the "**Business**") in the ordinary course and in a manner consistent with the preservation of the Business and the Property.   The Petitioners shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively, "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for carrying out the terms of this Order.

**CASH MANAGEMENT SYSTEM**

5.     The Petitioners shall be entitled to continue to utilize the central cash management system currently in place as described in the Gilbert Affidavit or, with the prior written consent of the Interim Lender (as hereinafter defined) and the Monitor, replace it with another substantially similar central cash management system (the "**Cash Management System**"), and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by any of the Petitioners of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Petitioners, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan (if any) with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.     Subject to the terms of the DIP Term Sheet and Definitive Documents (each, as hereinafter defined), the Petitioners shall be entitled, but not required, to pay the following expenses which may have been incurred prior to the Order Date:

   (a)     all outstanding wages, salaries, employee and pension benefits (including long and short term disability payments), vacation pay and expenses (but excluding severance pay) payable before or after the Order Date, in each case incurred in the ordinary course of business and consistent with the relevant compensation policies and arrangements existing at the time incurred (collectively "**Wages**");

   (b)     the fees and disbursements of any Assistants retained or employed by any of the Petitioners which are related to the Restructuring (as hereinafter defined), at their standard rates and charges, including payment of the fees and disbursements of legal counsel retained by the Petitioners, whenever and wherever incurred, in respect of:

70855982.8

        (i)       these proceedings or any other similar proceedings in other jurisdictions in which any of the Petitioners or any subsidiaries or affiliated companies of the Petitioners are domiciled;

        (ii)      any litigation in which any of the Petitioners are named as a party or are otherwise involved, whether commenced before or after the Order Date; and

        (iii)     any related corporate matters; and

    (c)      with the prior written consent of the Monitor and the Interim Lender, amounts owing for goods and services actually supplied to the Petitioners in the ordinary course of business and consistent with existing policies and procedures (including, without limitation, outstanding source deductions owing to governmental authorities).

7.     Except as otherwise provided herein and subject to the terms of the DIP Term Sheet and Definitive Documents, the Petitioners shall be entitled to pay all expenses reasonably incurred by the Petitioners in carrying on the Business in the ordinary course following the Order Date, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

    (a)      all expenses and capital expenditures reasonably incurred and which are necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services, provided that any capital expenditure exceeding $100,000 shall be approved by the Monitor;

    (b)      all obligations incurred by the Petitioners after the Order Date, including without limitation, with respect to goods and services actually supplied to the Petitioners following the Order Date (including those under purchase orders outstanding at the Order Date but excluding any interest on the Petitioners' obligations incurred prior to the Order Date); and

    (c)      fees and disbursements of the kind referred to in paragraph 6(b) which may be incurred after the Order Date.

8.     The Petitioners are authorized to remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from Wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes or any such claims which are to be paid pursuant to Section 6(3) of the CCAA;

(b)     all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Petitioners in connection with the sale of goods and services by the Petitioners, but only where such Sales Taxes accrue or are collected after the Order Date, or where such Sales Taxes accrued or were collected prior to the Order Date but not required to be remitted until on or after the Order Date; and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal property taxes, municipal business taxes or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors.

9.     Until such time as a real property lease is disclaimed in accordance with the CCAA, the Petitioners shall pay, without duplication, all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable as rent to the landlord under the lease, but for greater certainty, excluding accelerated rent or penalties, fees or other charges arising as a result of the insolvency of the Petitioners or the making of this Order) based on the terms of existing lease arrangements or as otherwise may be negotiated between the Petitioners and the landlord from time to time ("**Rent**"), for the period commencing from and including the Order Date, twice-monthly in equal payments on the first and fifteenth day of the month in advance (but not in arrears).  On the date of the first of such payments, any Rent relating to the period commencing from and including Order Date shall also be paid.

10.     Except as specifically permitted herein and subject to the DIP Term Sheet and the
Definitive Documents, the Petitioners are hereby directed, until further Order of this Court:

   (a)     to make no payments of principal, interest thereon or otherwise on account of
           amounts owing by any of the Petitioners to any of their respective creditors as of
           the Order Date except as authorized by this Order;

   (b)     to make no payments in respect of any financing leases which create security
           interests;

   (c)     to grant no security interests, trust, mortgages, liens, charges or encumbrances
           upon or in respect of any of their Property, nor become a guarantor or surety
           (other than in the ordinary course of the Business and with the prior written
           consent of the Interim Lender, where a completion guarantee or other bond is
           required to be posted by one or more of the Petitioners in connection with the
           production of an animated or live-action film, series television or other
           production), nor otherwise become liable in any manner with respect to any other
           Person or entity except as authorized by this Order;

   (d)     to not grant credit except in the ordinary course of the Business only to their
           customers for goods and services actually supplied to those customers, provided
           such customers agree that there is no right of set-off in respect of amounts owing
           for such goods and services against any debt owing by the Petitioners to such
           customers as of the Order Date; and

   (e)     to not incur liabilities except in the ordinary course of Business.

**RESTRUCTURING**

11.     Subject to such requirements as are imposed by the CCAA and such covenants as may
be contained in the DIP Term Sheet or Definitive Documents, the Petitioners shall have the
right to:

   (a)     permanently or temporarily cease, downsize or shut down all or any part of their
           Business or operations and commence marketing efforts in respect of any of their

70855982.8

redundant or non-material assets and to dispose of redundant or non-material assets not exceeding $ 500,000 in any one transaction or $ 1,000,000 in the aggregate;

(b)     terminate the employment of such of their employees or temporarily lay off such of their employees as they deem appropriate; and

(c)     pursue all avenues of refinancing for their Business or Property, in whole or part;

all of the foregoing to permit the Petitioners to proceed with an orderly restructuring of the Business (the "**Restructuring**").

12.     The Petitioners shall provide each of the relevant landlords with notice of the Petitioners' intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Petitioners' entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors who claim a security interest in the fixtures, such landlord and the Petitioners, or by further Order of this Court upon application by the Petitioners, the landlord or the applicable secured creditors on at least two (2) clear days' notice to the other parties. If the Petitioners disclaims the lease governing such leased premises in accordance with Section 32 of the CCAA, they shall not be required to pay Rent under such lease pending resolution of any dispute concerning such fixtures (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Petitioners' claim to the fixtures in dispute.

13.     If a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then: (a) during the period prior to the effective time of the disclaimer, the landlord may show the affected leased premises to prospective tenants during normal business hours on giving the Petitioners and the Monitor 24 hours' prior written notice; and (b) at the effective time of the disclaimer, the landlord shall be entitled to take possession of any such leased premises without

waiver of or prejudice to any claims the landlord may have against the Petitioners, or any other rights the landlord might have, in respect of such lease or leased premises and the landlord shall be entitled to notify the Petitioners of the basis on which it is taking possession and gain possession of and re-lease such leased premises to any third party or parties on such terms as the landlord considers advisable, provided that nothing herein shall relieve the landlord of its obligation to mitigate any damages claimed in connection therewith.

14.     Pursuant to Section 7(3)(c) of the *Personal Information Protection and Electronics Documents Act*, S.C. 2000, c. 5 and Section 18(1)(o) of the *Personal Information Protection Act*, S.B.C. 2003, c. 63, and any regulations promulgated under authority of either Act, as applicable (the "**Relevant Enactment**"), the Petitioners, in the course of these proceedings, are permitted to, and hereby shall, disclose personal information of identifiable individuals in their possession or control to stakeholders, their advisors, prospective investors, financiers, buyers or strategic partners (collectively, "**Third Parties**"), but only to the extent desirable or required to negotiate and complete the Restructuring or to prepare and implement the Plan or transactions for that purpose; provided that the Third Parties to whom such personal information is disclosed enter into confidentiality agreements with the Petitioners binding them in the same manner and to the same extent with respect to the collection, use and disclosure of that information as if they were an organization as defined under the Relevant Enactment, and limiting the use of such information to the extent desirable or required to negotiate or complete the Restructuring or to prepare and implement the Plan or transactions for that purpose, and attorning to the jurisdiction of this Court for the purposes of that agreement.  Upon the completion of the use of personal information for the limited purposes set out herein, the Third Parties shall return the personal information to the Petitioners or destroy it.  If the Third Parties acquire personal information as part of the Restructuring or the preparation and implementation of the Plan or transactions in furtherance thereof, such Third Parties may, subject to this paragraph and any Relevant Enactment, continue to use the personal information in a manner which is in all respects identical to the prior use thereof by the Petitioners.

**STAY OF PROCEEDINGS, RIGHTS AND REMEDIES**

15.     Until and including July 29, 2023, or such later date as this Court may order (the "**Stay Period**"), no action, suit or proceeding in any court or tribunal (each, a "**Proceeding**") against or in respect of the Petitioners or the Monitor, or affecting the Business or the Property, shall be commenced or continued except with the prior written consent of the Petitioners and the Monitor or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Petitioners or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

16.     During the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of any of the Petitioners or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the prior written consent of the Petitioners and the Monitor or leave of this Court.

17.     Nothing in this Order, including paragraphs 15 and 16, shall: (i) empower the Petitioners to carry on any business which the Petitioners are not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a mortgage, charge or security interest (subject to the provisions of Section 39 of the CCAA relating to the priority of statutory Crown securities); or (iv) prevent the registration or filing of a lien or claim for lien or the commencement of a Proceeding to protect lien or other rights that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such lien, claim for lien or Proceeding except for service of the initiating documentation on the Petitioners.

**STAY IN RESPECT OF THE NON-PETITIONER ENTITIES**

18.     During the Stay Period, no Person shall (a) commence any Proceeding or enforcement process, (b) terminate, repudiate, make any demand, accelerate, alter, amend, declare in default,

exercise any options, rights or remedies, or (c) discontinue, fail to honour, alter, interfere with or cease to perform any obligation pursuant to or in respect of any agreement, lease, sublease license or permit with respect to which any of the Non-Petitioner Entities (as defined in the Gilbert Affidavit) listed at **Schedule "B"** hereto are a party, borrower, principal obligor or guarantor, by reason of:

(a)    any of the Petitioners being insolvent, having become subject to insolvency proceedings, or having made an petition to this Court under the CCAA or the granting of this Order;

(b)    any of the Petitioners being party to these proceedings or taking any steps related thereto;

(c)    the stay of proceedings granted pursuant to this paragraph 18;

(d)    any default or cross-default arising from the matters set out in the foregoing subparagraphs (a) to (c),

except with the prior written consent of the Petitioners and the Monitor, or with leave of this Court.

## NO INTERFERENCE WITH RIGHTS

19.    During the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, rescind, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, licence, authorization or permit in favour of or held by any of the Petitioners, except with the prior written consent of the Petitioners and the Monitor or leave of this Court.

## CONTINUATION OF SERVICES

20.      During the Stay Period, all Persons having oral or written agreements with any of the
Petitioners or mandates under an enactment for the supply of goods and/or services, including
without limitation all computer software, communication and other data services, centralized
banking services, payroll and benefit services, accounting services, insurance, transportation,
services, utility, or other services, to the Business or any of the Petitioners, are hereby restrained
until further Order of this Court from discontinuing, altering, interfering with, suspending or
terminating the supply of such goods or services as may be required by any of the Petitioners,
and that the Petitioners shall be entitled to the continued use of their current premises, telephone
numbers, facsimile numbers, internet addresses and domain names, provided in each case that
the normal prices or charges for all such goods or services received after the Order Date are paid
by the Petitioners in accordance with normal payment practices of the Petitioners or such other
practices as may be agreed upon by the supplier or service provider and the applicable
Petitioners and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

21.      Notwithstanding any provision in this Order, no Person shall be prohibited from
requiring immediate payment for goods, services, use of leased or licensed property or other
valuable consideration provided on or after the Order Date, nor shall any Person be under any
obligation to advance or re-advance any monies or otherwise extend any credit to the Petitioners
on or after the Order Date. Nothing in this Order shall derogate from the rights conferred and
obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

22.      During the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA,
no Proceeding may be commenced or continued against the directors or officers of any of the
Petitioners with respect to any claim against the directors or officers that arose before the date
hereof and that relates to any obligations of any of the Petitioners whereby the directors or
officers are alleged under any law to be liable in their capacity as directors or officers for the

70855982.8

payment or performance of such obligations, until a compromise or arrangement in respect of the Petitioners, if one is filed, is sanctioned by this Court or is refused by the creditors of the Petitioners or this Court. Nothing in this Order, including in this paragraph, shall prevent the commencement of a Proceeding to preserve any claim against a director or officer of any of the Petitioners that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such Proceeding except for service of the initiating documentation on the applicable director or officer.

### DIRECTORS AND OFFICERS INDEMNIFICATION AND CHARGE

23.     The Petitioners shall indemnify their directors and officers against obligations and liabilities that they may incur as directors or officers of the Petitioners after the commencement of the within proceedings, except to the extent that, with respect to any director or officer, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

24.     The directors and officers of the Petitioners shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of USD $250,000, as security for the indemnity provided in paragraph 22 of this Order.  The Directors' Charge shall have the priority set out in paragraphs 41 and 43 herein.

25.     Notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Petitioners' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

**APPOINTMENT OF MONITOR**

26.     Grant Thornton Limited is hereby appointed pursuant to the CCAA as the Monitor, an
officer of this Court, to monitor the business and financial affairs of the Petitioners with the
powers and obligations set out in the CCAA or set forth herein, and that the Petitioners and their
shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps
taken by the Petitioners pursuant to this Order, and shall co-operate fully with the Monitor in
the exercise of its powers and discharge of its obligations and provide the Monitor with the
assistance that is necessary to enable the Monitor to adequately carry out the Monitor's
functions.

27.     The Monitor, in addition to its prescribed rights and obligations under the CCAA, is
hereby directed and empowered to:

(a)     monitor the Petitioners' receipts and disbursements;

(b)     report to this Court at such times and intervals as the Monitor may deem
appropriate with respect to matters relating to the Property, the Business, the DIP
Term Sheet, the Definitive Documents and such other matters as may be relevant
to the proceedings herein;

(c)     assist the Petitioners, to the extent required by the Petitioners, in their
dissemination, to the Interim Lender and its counsel, as and when required or
permitted under the DIP Term Sheet or the Definitive Documents or as otherwise
reasonably required by the Interim Lender, of financial and other information as
agreed to between the Petitioners and the Interim Lender which may be used in
these proceedings including reporting on a basis to be agreed with the Interim
Lender;

(d)     advise the Petitioners in their preparation of the Petitioners' cash flow statements
and reporting required by the Interim Lender, which information shall be
reviewed with the Monitor and delivered to the Interim Lender and its counsel as

and when required under the DIP Term Sheet and the Definitive Documents or
as otherwise agreed to by the Interim Lender;

(e)     advise the Petitioners in their development of the Plan and any amendments to
the Plan;

(f)     assist the Petitioners, to the extent required by the Petitioners, with the holding
and administering of creditors' or shareholders' meetings for voting on the Plan;

(g)     monitor all payments, obligations and transfers as between any of the Petitioners;

(h)     have full and complete access to the Property, including the premises, books,
records, data, including data in electronic form, and other financial documents of
the Petitioners, to the extent that is necessary to adequately assess the
Petitioners' business and financial affairs or to perform its duties arising under
this Order;

(i)     be at liberty to engage independent legal counsel or such other Persons as the
Monitor deems necessary or advisable respecting the exercise of its powers and
performance of its obligations under this Order; and

(j)     perform such other duties as are required by this Order or by this Court from
time to time.

28.     The Monitor shall not take possession of the Property and shall take no part whatsoever
in the management or supervision of the management of the Business and shall not, by fulfilling
its obligations hereunder, or by inadvertence in relation to the due exercise of powers or
performance of duties under this Order, be deemed to have taken or maintained possession or
control of the Business or Property, or any part thereof, and nothing in this Order shall be
construed as resulting in the Monitor being an employer or a successor employer, within the
meaning of any statute, regulation or rule of law or equity, for any purpose whatsoever.

70855982.8

29.     Nothing herein contained shall require or allow the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, **"Possession"**) of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Fisheries Act*, the British Columbia *Environmental Management Act*, the British Columbia *Fish Protection Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. For greater certainty, the Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.     The Monitor shall provide any creditor of the Petitioners and the Interim Lender with information provided by the Petitioners in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Petitioners is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Petitioners may agree.

31.     In addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the rights and protections afforded the Monitor by the CCAA or any applicable legislation.

32.     The Monitor, counsel to the Monitor, if any, and counsel to the Petitioners shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the

Petitioners as part of the cost of these proceedings. The Petitioners are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor and counsel to the Petitioners on a periodic basis and, in addition, the Petitioners are hereby authorized to pay to the Monitor, counsel to the Monitor, and counsel to the Petitioners, retainers in the amount[s] of $50,000, respectively, to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

33.     The Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the British Columbia Supreme Court who may determine the manner in which such accounts are to be passed, including by hearing the matter on a summary basis or referring the matter to a Registrar of this Court.

**ADMINISTRATION CHARGE**

34.     The Monitor, counsel to the Monitor, if any, and counsel to the Petitioners shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of USD $250,000, as security for their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order which are related to the Petitioners' restructuring. The Administration Charge shall have the priority set out in paragraphs 41 and 43 hereof.

**INTERIM FINANCING**

35.     The Petitioners are hereby authorized and empowered to obtain and borrow under a credit facility (the "**DIP Facility**") from Creative Wealth Media Lending LP 2016 (the "**Interim Lender**") in order to finance the continuation of the Business and preservation of the Property, all in accordance with the DIP Term Sheet and the Definitive Documents, provided that borrowings under the DIP Facility shall not exceed the aggregate principal amount of USD $1,751,409 unless permitted by further Order of this Court.

36.    The DIP Facility shall be on the terms and subject to the conditions set forth in the DIP Term Sheet between the Petitioners and the Interim Lender dated as of July 18, 2023 (the "**DIP Term Sheet**"), filed.

37.    The Petitioners are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the Interim Lender pursuant to the terms thereof, and the Petitioners are hereby authorized and directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the Interim Lender under and pursuant to the DIP Term Sheet and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

38.    The Interim Lender shall be entitled to the benefit of and is hereby granted a charge (the "**Interim Lender's Charge**") on the Property up to the maximum amount of USD $1,751,409. (plus accrued and unpaid interest, fees and expenses) to secure amounts advanced under the DIP Facility. The Interim Lender's Charge shall not secure an obligation that exists before this Order is made.  The Interim Lender's Charge shall have the priority set out in paragraphs 41 and 43 hereof.

39.    Notwithstanding any other provision of this Order:

(a)     the Interim Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the Interim Lender's Charge or any of the Definitive Documents;

(b)     upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet), whether or not there is availability under the DIP Facility and notwithstanding any stay imposed under this Order: (i) without any notice to the Petitioners, the Petitioners shall have no right to receive any additional advances thereunder or other accommodation of credit from the Interim Lender except in the sole discretion of the Interim Lender; and (ii) the

Interim Lender may immediately terminate the DIP Facility and demand immediate payment of all obligations owing thereunder by providing such notice and demand to the Petitioners, with a copy to the Monitor;

(c)     with leave of this Court, sought on not less than three (3) business days' notice to the Petitioners and the Monitor after the occurrence and during the continuance of an Event of Default, the Interim Lender shall have the right to enforce the Interim Lender's Charge and to exercise all other rights and remedies in respect of the obligations owing under the DIP Facility and the Interim Lender's Charge; and

(d)     the foregoing rights and remedies of the Interim Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Petitioners or the Property.

40.     The Interim Lender, in such capacity, shall be treated as unaffected in any plan of arrangement or compromise filed by the Petitioners under the CCAA, or any proposal filed by the Petitioners under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

41.     The priorities of the Administration Charge, the Directors' Charge and the Interim Lender's Charge (collectively, the "Charges", as among them, shall be as follows:

First – Administration Charge (to the maximum amount of USD $250,000);

Second – Interim Lender's Charge (to the maximum amount of USD $1,751,409.00 plus accrued and      unpaid interest, fees and expenses);

Third – Directors' Charge (to the maximum amount of USD $250,000).

42.     Any security documentation evidencing, or the filing, registration or perfection of, the Charges shall not be required, and that the Charges shall be effective as against the Property and

shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered or perfected subsequent to the Charges coming into existence, notwithstanding any failure to file, register or perfect any such Charges.

43.     Each of the Charges shall constitute a mortgage, hypothec, security interest, assignment by way of security and charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, mortgages, charges and encumbrances and claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**"), in favour of any Person, save and except those claims contemplated by section 11.8(8) of the CCAA. Notwithstanding the foregoing or any other provision of this Order, the Charges shall not constitute an Encumbrance on any Property subject to an Encumbrance in favour of Comerica Bank; provided, however, that such exception shall be without prejudice to the ability of the Petitioners and the beneficiaries of the Charges to seek priority of the Charges ahead of or subordinate to additional Encumbrances on notice to those Persons likely to be affected by such Charge, including, without limitation, Comerica Bank.

44.     Except as otherwise expressly provided herein, or as may be approved by this Court, the Petitioners shall not grant or suffer to exist any Encumbrances over any Property that rank in priority to, or *pari passu* with the Charges, unless the Petitioners obtain the prior written consent of the Monitor, the Interim Lender and the beneficiaries of the Administration Charge and the Director's Charge.

45.     The Charges, the DIP Term Sheet and the Definitive Documents shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the Interim Lender shall not otherwise be limited or impaired in any way by: (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) or receivership order(s) issued pursuant to the BIA or otherwise, or any bankruptcy order or receivership order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents,

lease, mortgage, security agreement, debenture, sublease, offer to lease or other agreement
(collectively, an "**Agreement**") which binds the Petitioners; and notwithstanding any provision
to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection,
        registration or performance of the DIP Term Sheet or the Definitive Documents
        shall create or be deemed to constitute a breach by any of the Petitioners of any
        Agreement to which any of the Petitioners is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result
        of any breach of any Agreement caused by or resulting from the Petitioners
        entering into the DIP Term Sheet, the creation of the Charges, or the execution,
        delivery or performance of the Definitive Documents; and

(c)     the payments made by the Petitioners pursuant to this Order, the DIP Term Sheet
        or the Definitive Documents, and the granting of the Charges, do not and will not
        constitute preferences, fraudulent conveyances, transfers at undervalue,
        oppressive conduct, or other challengeable or voidable transactions under any
        applicable law.

46.     Any Charge created by this Order over leases of real property in Canada shall only be a
Charge in the Petitioners' interest in such real property leases.

**SERVICE AND NOTICE**

47.     The Monitor shall: (i) without delay, publish in *The Globe and Mail* (National Edition)
a notice containing the information prescribed under the CCAA; and (ii) within five days after
Order Date, (A) make this Order publicly available in the manner prescribed under the CCAA,
(B) send, in the prescribed manner, a notice to every known creditor who has a claim against the
Petitioners of more than $1,000, and (C) prepare a list showing the names and addresses of
those creditors and the estimated amounts of those claims, and make it publicly available in the

prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

48.    The Petitioners and the Monitor are at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Petitioners' creditors or other interested parties at their respective addresses as last shown on the records of the Petitioners and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

49.    Any Person that wishes to be served with any application and other materials in these proceedings must deliver to the Monitor by way of ordinary mail, courier, personal delivery or electronic transmission a request to be added to a service list (the "**Service List**") to be maintained by the Monitor. The Monitor shall post and maintain an up to date form of the Service List on its website at: www.grantthornton.ca/BronMedia.

50.    Any party to these proceedings may serve any court materials in these proceedings by emailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, and the Monitor shall post a copy of all prescribed materials on its website at: www.grantthornton.ca/BronMedia.

51.    Notwithstanding paragraphs 48 and 50 of this Order, service of the Petition, the Notice of Hearing of Petition, any affidavits filed in support of the Petition and this Order shall be made on the Federal and British Columbia Crowns in accordance with the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, and regulations thereto, in respect of the Federal Crown, and the *Crown Proceeding Act*, R.S.B.C. 1996, c. 89, in respect of the British Columbia Crown.

## FOREIGN PROCEEDINGS

52.    BRON Media Corp., or any of the Petitioners, are hereby authorized and empowered to act as the foreign representative (as applicable, the "**Foreign Representative**") in respect of

these proceedings of the purpose of having these proceedings recognized in a foreign jurisdiction.

53.     The Foreign Representative is authorized to apply for foreign recognition of these proceedings, as necessary or advisable, in any jurisdiction outside of Canada including, without limitation, the United States pursuant to Chapter 15 of Title 11 of the United States Code 11 U.S.C., §§ 101 – 1532, the United Kingdom, Ireland and New Zealand.

**GENERAL**

54.     The Petitioners or the Monitor may from time to time apply to this Court for directions in the discharge of their powers and duties hereunder.

55.     Nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Petitioners, the Business or the Property.

56.     This Court requests the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any federal or State Court or administrative body in the United States of America, the United Kingdom, or any other foreign jurisdiction, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Foreign Representative, the Petitioners and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Foreign Representative in any foreign proceeding, or to assist the Foreign Representative, Petitioners and the Monitor and their respective agents in carrying out the terms of this Order.

57.     The Petitioners are hereby at liberty to apply for such further interim or interlocutory relief as it deems advisable within the time limited for Persons to file and serve Responses to the Petition.

58.     Leave is hereby granted to hear any application in these proceedings on two (2) clear days' notice after delivery to all parties on the Service List of such Notice of Application and all affidavits in support, subject to the Court in its discretion further abridging or extending the time for service.

59.     Any interested party (including the Petitioners, the Interim Lender and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to all parties on the Service List and to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

60.     Eendorsement of this Order by counsel appearing on this application is hereby dispensed with.

61.     This Order and all of its provisions are effective as of 12:01 a.m. local Vancouver time on the Order Date.

62.     Leave is hereby granted for counsel to appear at future hearings in this matter remotely by video.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

Signature of
☐ Party  ☑ Lawyer for the Petitioners

Asim Iqbal

Bryan Hicks

BY THE COURT

REGISTRAR

Certified a true copy according to
the records of the Supreme Court
at Vancouver, B.C.
DATED:     JUL 1 9 2023

Authorized Signing Officer

Taranjeet Kaur

Form
CHECKED

## Schedule "A"

### List of Petitioners

|     | **Debtor Company** | **Jurisdiction** |
| --- | --- | --- |
| 1.  | BRON Animation Inc. | British Columbia |
| 2.  | BRON Creative Corp. | Ontario |
| 3.  | BRON Developments Inc. | British Columbia |
| 4.  | BRON Media Corp. | British Columbia |
| 5.  | BRON Media Holdings Intl. Corp. | British Columbia |
| 6.  | BRON Media Holdings USA Inc. | British Columbia |
| 7.  | BRON Releasing Inc. | British Columbia |
| 8.  | BRON Studios Inc. | British Columbia |
| 9.  | BRON Ventures 1 (Canada) Corp | British Columbia |
| 10. | BRON Everest Productions Inc. | Ontario |
| 11. | Fables Productions BC Inc. | British Columbia |
| 12. | Gossamer Productions BC Inc. | British Columbia |
| 13. | Hench 2 BC Productions Inc. | British Columbia |
| 14. | Henchmen Productions Inc. | British Columbia |
| 15. | Robin Hood Digital PC BC Inc. | British Columbia |
| 16. | Windor Productions BC Inc. | British Columbia |
| 17. | BRON Creative USA, Corp. | Nevada |
| 18. | BRON Digital USA, LLC | Delaware |
| 19. | BRON Life USA Inc. (BRON Legacy USA Inc.) | Delaware |
| 20. | BRON Media Holdings USA Corp. | Delaware |
| 21. | BRON Releasing USA Inc. | Delaware |
| 22. | BRON Studios USA Inc. | Nevada |

| 23. | BRON Ventures 1, LLC | Delaware |
|---|---|---|
| 24. | BRON Studios USA Developments Inc. | Nevada |
| 25. | Bakhorma, LLC | Washington |
| 26. | Drunk Parents, LLC | New York |
| 27. | Fables Holdings USA, LLC | Delaware |
| 28. | Fables Productions USA Inc | Delaware |
| 29. | Gossamer Holdings USA, LLC | Delaware |
| 30. | Gossamer Productions USA Inc. | Delaware |
| 31. | Harry Haft Productions, Inc. | New York |
| 32. | Heavyweight Holdings, LLC (previously Harry Haft Films, LLC) | Delaware |
| 33. | I Am Pink Productions, LLC | Delaware |
| 34. | Lucite Desk, LLC | Delaware |
| 35. | National Anthem Holdings, LLC (f. k. a. BCDC Holdings, LLC) | Delaware |
| 36. | National Anthem ProdCo Inc. | New Mexico |
| 37. | Oakland Pictures Holdings, LLC | Delaware |
| 38. | Pathway Productions, LLC | Delaware |
| 39. | Robin Hood Digital PC USA Inc. | Delaware |
| 40. | Robin Hood Digital USA, LLC | Delaware |
| 41. | Solitary Holdings USA, LLC | Delaware |
| 42. | Surrounded Holdings USA LLC | Delaware |
| 43. | Welcome to Me, LLC | California |

## Schedule "B"

Non-Petitioner Entities

BRON Studios UK Ltd.
BRON Releasing UK Ltd.
CMA Productions UK Ltd.
In Good Company Holdings Ltd.
Kid Unknown Holdings Ltd (fka Hunaman Holdings Ltd.)
Neon Club Productions, Ltd.
Shadowplay Series Holdings UK Limited
TDBB Holdings UK Ltd.
Townsend Series Holdings UK Ltd.
Townsend Series Holdings UK Ltd.
Townsend Series Productions UK Ltd. (Grèy Door Film Productions Ltd)
Front Runner Productions, Inc.
BRON Creative MG1, LLC
BRON Creative WB 1, LLC
BRON Labs LLC
A Single Shot Movie, LLLP
Blackhand Developments Inc.
Blackhand Pictures, LLC
BRON Next Film Production, LLC (BRON Life, LLC)
BRON Pictures Holdings, LLC
BRON Subnation Slate 1, LLC
Rideg Film Holdings, LLC
Brown Amy, LLC
Driftless Area, LLC
Drunk Parents Production Services Inc.
Erostratus LA, LLC
Erostratus, LLC
Fonzo Production Services Inc.
Fonzo, LLC
Front Runner, LLC
Green Moon Inc.

## Schedule "C"

List of Counsel

**LIST OF COUNSEL**

| Name | Party |
|------|-------|
| J. Schultz | Comerica Bank |
| J. Salmaz | Comerica Bank |
| D. Gruber | Creative Wealth Media |
| M. Shakra | Creative Wealth Media |
| J. Foster | Creative Wealth Media |
| J. Birch | Grant Thornton LLP |
| R. Mittal | Grant Thornton LLP |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

## <u>EXHIBIT B</u>

***Declaration of Aaron Gilbert in Support of the Debtors'***
***Chapter 15 Petitions and First Day Pleadings in Foreign Proceeding***

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| In re: | Chapter 15 |
|---|---|
| BRON Creative USA, Corp. | Case No. 23-56799 |
| BRON Digital USA, LLC | Case No. 23-56801 |
| BRON Life USA Inc.  f/k/a BRON Legacy USA Inc. | Case No. 23-56802 |
| BRON Media Holdings USA Corp. | Case No. 23-56798 |
| BRON Releasing USA Inc. | Case No. 23-56803 |
| BRON Studios USA Inc. | Case No. 23-56804 |
| BRON Ventures 1, LLC | Case No. 23-56806 |
| BRON Studios USA Developments Inc. | Case No. 23- 56805 |
| Bakhorma, LLC | Case No. 23-56807 |
| Drunk Parents, LLC | Case No. 23-56808 |
| Fables Holdings USA, LLC | Case No. 23-56809 |
| Fables Productions USA Inc | Case No. 23-56810 |
| Gossamer Holdings USA, LLC | Case No. 23-56811 |
| Gossamer Productions USA Inc. | Case No. 23-56812 |
| Harry Haft Productions, Inc. | Case No. 23-56813 |
| Heavyweight Holdings, LLC f/k/a Harry Haft Films, LLC | Case No. 23-56815 |
| I Am Pink Productions, LLC | Case No. 23-56817 |
| Lucite Desk, LLC | Case No. 23-56818 |
| National Anthem Holdings, LLC f/k/a BCDC Holdings, LLC | Case No. 23-56819 |
| National Anthem ProdCo Inc. | Case No. 23-56820 |
| Oakland Pictures Holdings, LLC | Case No. 23-56821 |
| Pathway Productions, LLC | Case No. 23-56823 |
| Robin Hood Digital PC USA Inc. | Case No. 23-56824 |
| Robin Hood Digital USA, LLC | Case No. 23-56825 |
| Solitary Holdings USA, LLC | Case No. 23-56826 |
| Surrounded Holdings USA LLC | Case No. 23-56827 |
| Welcome To Me, LLC | Case No. 23-56828 |
| **Debtors in a Foreign Proceeding.** | **Joint Administration Requested.** |

**DECLARATION OF AARON GILBERT
IN SUPPORT OF THE DEBTORS' CHAPTER 15
PETITIONS AND FIRST-DAY PLEADINGS IN FOREIGN  PROCEEDING**

I, Aaron Gilbert, hereby declare that the following is true and correct to the best of my knowledge, information, and belief.

1.      I am Chairman and Chief Executive Officer ("CEO") of the BRON Group of Companies[1] (as defined below) ("BRON Group," or collectively, the "Debtors"). I have over 13 years of experience as a producer, executive producer and financier of live-action and animated motion pictures and series television. I co-founded the BRON Group in 2010 with my wife, Brenda Gilbert. I am a member of the Academy of Motion Pictures Arts & Sciences. I am also a member of the Academy of Television Arts & Sciences. I am a member of the Producers Guild of America. I began my career in the music industry, then founded and operated a company in the content licensing space, prior to the BRON Group. I have served as producer and executive producer on more than 125 productions, many of which have achieved critical acclaim and commercial success. BRON Media Corp.—a member entity of the BRON Group—is the duly appointed and authorized foreign representative (the "Foreign Representative") for the above captioned Debtors, which Debtors are the subjects of reorganization proceedings (the "CCAA Proceeding") commenced before the Supreme Court of British Columbia (the "Canadian Court") under Canada's *Companies' Creditors Arrangement Act* (the "CCAA").

---

[1] The U.S. Debtors in these Chapter 15 cases and the last four digits of their U.S. Federal Employer Identification Numbers are as follows: BRON Creative USA Corp (1363); BRON Digital USA, LLC (0276); BRON Life USA Inc. (1178); BRON Media Holdings USA Corp (0637); BRON Releasing USA Inc. (6368); BRON Studios USA Inc. (8784); BRON Ventures 1 LLC (5066); BRON Studios USA Developments Inc. (7529); Bakhorma, LLC (6944); Drunk Parents, LLC (5462); Fables Holdings USA, LLC (8085); Fables Productions USA INC. (5169); Gossamer Holdings USA, LLC (2582); Gossamer Productions USA, Inc. (7876); Harry Haft Productions, Inc. (6144); Heavyweight Holdings, LLC f/k/a Harry Haft Films, LLC (8193); I am Pink Productions, LLC (6681); Lucite Desk, LLC (2546); National Anthem Holdings, LLC f/k/a BCDC Holdings, LLC (6943); National Anthem ProdCo Inc. (8637); Oakland Pictures Holdings, LLC (4988); Pathway Productions, LLC (Del. Incorporation No. 3081); Robin Hood Digital PC USA Inc. (2499); Robin Hood Digital USA, LLC (4302); Solitary Holdings USA, LLC (3013); Surrounded Holdings USA LLC (8868); and Welcome to Me, LLC (8500) (hereinafter collectively referred to as the "Debtors"). The Debtors' principal offices are located at 1700-Park Place, 666 Burrard Street, Vancouver, British Columbia, Canada.

2.    The member entities of the "BRON Group" are more specifically the following:

| **BRON GROUP OF COMPANIES** | |
|---|---|
| **Canadian Debtors** | BRON Animation Inc.  (British Columbia)<br>BRON Creative Corp. (Ontario)<br>BRON Developments Inc. (British Columbia)<br>BRON Media Corp.  (British Columbia)<br>BRON Media Holdings Intl. Corp.   (British Columbia)<br>BRON Media Holdings USA Inc.  (British Columbia)<br>BRON Releasing Inc.   (British Columbia)<br>BRON Studios Inc.  (British Columbia)<br>BRON Ventures 1 (Canada) Corp  (British Columbia)<br>Canadian Production HoldCos & ProdCos[1] |
| **U.S. Debtors** | BRON Creative USA Corp. (Nevada)<br>BRON Digital USA, LLC  (Delaware)<br>BRON Life USA Inc.   (Delaware)<br>BRON Media Holdings USA Corp. (Delaware)<br>BRON Releasing USA Inc.  (Delaware)<br>BRON Studios USA Inc.  (Nevada)<br>BRON Ventures 1 LLC   (Delaware)<br>BRON Studios USA Developments Inc. (Nevada)<br>US Production HoldCos & ProdCos[2] |
| **UK Debtors** | BRON Studios UK Ltd.    (England and Wales)<br>BRON Releasing UK Ltd.  (England and Wales)<br>CMA Productions UK Ltd. (England and Wales)<br>In Good Company Holdings Ltd. (England and Wales)<br>Kid Unknown Holdings Ltd (fka Hunaman Holdings Ltd.) (England and Wales)<br>Neon Club Productions, Ltd. (England and Wales)<br>Shadowplay Series Holdings UK Limited (England and Wales)<br>TDBB Holdings UK Ltd. (England and Wales)<br>Townsend Series Holdings UK Ltd. (England and Wales)<br>Townsend Series Holdings UK Ltd. (England and Wales)<br>Townsend Series Productions UK Ltd. (Grey Door Film |

---

[1]    BRON Everest Productions Inc., Fables Productions BC Inc., Gossamer Productions BC Inc., Hench 2 BC Productions Inc., Henchmen Productions Inc., Robin Hood Digital PC BC Inc., Windor Productions BC Inc. (collectively, the "**Canadian Production HoldCos & ProdCos**").

[2]  Bakhorma, LLC, Drunk Parents, LLC (Delaware) Fables Holdings USA, LLC (Delaware), Fables Productions USA Inc. (Delaware), Gossamer Holdings USA, LLC (Delaware), Gossamer Productions USA Inc. (Delaware), Harry Haft Productions, Inc. (New York), Heavyweight Holdings, LLC, previously Harry Haft Films, LLC (Delaware), I Am Pink Productions, LLC (Delaware), Lucite Desk, LLC (Delaware), National Anthem Holdings, LLC (f. k. a. BCDC Holdings, LLC) (Delaware), National Anthem ProdCo Inc. (New Mexico), Oakland Pictures Holdings, LLC (Delaware), Pathway Productions, LLC (Delaware), Robin Hood Digital PC USA Inc. (Delaware), Robin Hood Digital USA, LLC (Delaware), Solitary Holdings USA, LLC (Delaware), Surrounded Holdings USA LLC (Delaware), Surrounded Productions USA Inc. (Delaware), Welcome to Me, LLC (Delaware) (collectively, the "**US Production HoldCos & ProdCos**").

| | Productions Ltd) (England and Wales) |
|---|---|
| **Other Non Petitioner Entities** | Front Runner Productions, Inc.<br>BRON Creative MG1, LLC<br>BRON Creative WB 1, LLC<br>BRON Labs LLC<br>A Single Shot Movie, LLLP<br>Blackhand Developments Inc.<br>Blackhand Pictures, LLC<br>BRON Next Film Production, LLC (BRON Life, LLC)<br>BRON Pictures Holdings, LLC<br>BRON Subnation Slate 1, LLC<br>Rideg Film Holdings, LLC<br>Brown Amy, LLC<br>Driftless Area, LLC<br>Drunk Parents Production Services Inc.<br>Erostratus LA, LLC<br>Erostratus, LLC<br>Fonzo Production Services Inc.<br>Fonzo, LLC<br>Front Runner, LLC<br>Green Moon Inc.<br>Harmon Films, LLC<br>Harmon Monster Films, Inc.<br>I Saw The Light Movie, LLC<br>I Saw The Light, LLC<br>Layover LLC<br>Mad Solar Productions, LLC<br>Master Cleanse, LLC<br>Meadowland Movie, LLC<br>Meadowland Production Services Inc.<br>My Abandonment LLC<br>My Abandonment Production Services Inc.<br>Needle In A Timestack, LLC<br>October Series Holdings, LLC<br>Pangea Cup Holdings, LLC<br>Pangea Cup Productions Inc.<br>Para Productions, LLC<br>Phil Productions, LLC<br>Red Sea LLC<br>Red Sea Productions Inc.<br>Savant Developments Inc.<br>Summerland Holdings, LLC<br>The Good Nurse Films, LLC<br>The Realm Productions USA LLC<br>TMF Productions, LLC<br>Tully Productions, LLC |

| | Tumbledown, LLC |
| | TWWMD Holdings, LLC |
| | TWWMD Productions, Inc. |
| | Villains Pictures, LLC |
| | Villains Production Services, Inc. |
| | Wonder Book Holdings USA, LLC |
| | BRON Charitable Foundation, Inc. |
| | Hercules BRON Creative Partnership |

3.      On July 18, 2023, the Debtors filed applications under the CCAA to commence restructuring proceedings under the supervision of the Canadian Court.  On July 19, the Canadian Court entered an initial order (the "Initial Order"), a true and correct copy of which is filed contemporaneously herewith, appointing Grant Thorton Limited ("GTL" or the "Monitor") to monitor and assist the Debtors in their business and financial affairs in accordance with Section 23 of the CCAA. The Canadian Court also appointed the Foreign Representative to act as a representative in respect of the CCAA Proceeding for the purpose of having the CCAA Proceeding recognized in any other jurisdiction outside Canada, including the United States.

4.      Contemporaneously with the filing of this declaration, the Foreign Representative caused to be filed, on behalf of the Debtors as authorized Foreign Representative of the Debtors, petitions for recognition of the CCAA Proceeding in the United States under Chapter 15 of Title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the Debtors' Chapter 15 cases (the "Chapter 15 Cases"). Foreign Representative also caused to be filed the *Omnibus Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Initial Order and Amended Initial Order and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* (together with the Chapter 15 petitions, the "Petitions for Recognition") and the *Motion of the Foreign Representative for an Order Granting*

*Certain Provisional Relief* (the "<u>Provisional Relief Motion</u>").

5.      This declaration is filed in support of the Petitions for Recognition, the Provisional

Relief Motion and other "first day" relief requested by the Foreign Representative. I am making

this declaration in accordance with Section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of

the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

6.      In my role as Chairman and CEO of the BRON Group, I am familiar with the

Debtors' history, day-to-day operations, assets, financial condition, business affairs, and books

and records. I am fully aware of, and closely involved in, the financial affairs and overall

restructuring of the Debtors. Except as otherwise indicated, all statements in this declaration are

based upon my personal knowledge, my review of the Debtors' books and records, relevant

documents and other information prepared or filed in connection with the CCAA Proceeding and

the Chapter 15 Cases, information supplied to me by one or more of the Debtors' officers,

directors, and/or employees or other professionals retained by the Debtors, or my experience and

knowledge of the Debtors' operations and financial condition. If called to testify as a witness, I

could and would competently testify to each of the facts set forth herein based upon my personal

knowledge, review of documents, or opinion. I am authorized to submit this declaration on behalf

of the Debtors.

**A.      BRON Group Overview**

7.      The BRON Group  develops, produces and sells motion pictures, series television,

and digital media content, which includes animation and interactive gaming. To date, the BRON

Group has produced or executive produced more than 125 productions. It has received hundreds

of honors and produced or executive produced films that have combined to receive 38 Academy

Award nominations and 6 Academy Awards. Through its successful and culture-shifting productions, the BRON Group established itself as a reputable producer, trusted by many established, elite players in the North American entertainment industry.

8.      The BRON Group has operated in Canada since 2010, and currently operates from facilities in Burnaby, British Columbia. Over the past several years, the BRON Group has expanded its operations into the United States to allow it to better serve existing and new customers in the North American entertainment industry.

9.      The COVID-19 pandemic ("COVID") and the resulting government-mandated shutdowns, including in the entertainment industry, had a significant adverse impact on the Debtors' financial position. Large projects were scheduled for release in 2020 through large commercial industry players including Sony, Warner Bros Entertainment Inc., and MGM. Even when theatres gradually re-opened and the completed delayed productions were finally released, pandemic-related precautionary measures added significant costs to production budgets. The effect of which was magnified by the failure of the Debtors' films to generate their pre-COVID projected revenues.[2]

10.      Additionally, the ongoing labor dispute between the Writers Guild of America ("WGA"), which represents 11,500 screenwriters, and the Alliance of Motion Picture and Television Producers has resulted in a WGA strike, which has disrupted the Debtors' operations by causing a number of the Debtors' productions to be completely shut down or otherwise unexpectedly delayed.

---

[2] While the projected revenues for the Debtors' 2020 and 2021 film releases was approximately $4 billion in global box office revenue, in actuality they ended up generating less than 25% of that amount.

B.    **BRON Group Corporate Structure**

11.    The BRON Group's corporate structure is complex and contains over 100 entities. This structure is a function of the nature of the Debtors' global production business, and because the Debtors manage and operate each film or television production through special-purpose entities.  Three British Columbia corporations, BRON Media Holdings USA Inc., BRON Media Corp. and BRON Media Holdings Intl. Corp (together, the "<u>BRON Parents</u>") are the ultimate parent companies of the BRON Group.

12.    The BRON Parents have subsidiaries and productions in jurisdictions outside of Canada, including in the United States, the United Kingdom, Ireland, and New Zealand.

13.    Each of the BRON Parents is incorporated under British Columbia's *Business Corporations Act*. I am a director and officer of each of the BRON Parents.

14.    Executive decision-making for each entity in the BRON Group, including operational, strategic, and legal decisions, cash management, human resources, and oversight of local payroll and accounting functions occur in Burnaby, British Columbia.

15.    Each of the US Debtors listed above in Paragraph 2 *supra* are managed out of Canada, where all US Debtors have a center of main interests. To that end, all members of the Debtors executive management team are located in Canada. The Debtors' headquarters are located in Canada and all of the BRON Parents are Canadian entities registered in British Columbia. The Debtors' primary bank accounts are located in Canada. The significant assets of the Debtors consist of intellectual property which are held with the owners in Canada. The Debtors' largest creditors are located in Canada.

**C.**     **Financial Position**

16.     As a result of its financial challenges, outlined above, it became clear to the BRON Group that it would run out of liquidity. The Debtors determined that the BRON Group needed to restructure its business and financial picture if it was to survive. The Debtors sought a strategic partner to provide the financial resources and expertise necessary to allow it to complete this restructuring.

17.     On July 18, 2023, the Debtors entered into a DIP Loan Agreement (the "<u>DIP Loan Agreement</u>") with Creative Wealth Media Lending LP 2016 ("<u>Interim DIP Lender</u>"), which sets forth the terms and conditions pursuant to which the Interim DIP Lender is prepared to sponsor a court-supervised financial restructuring of the Debtors.

18.     Pursuant to the DIP Loan Agreement and subject to its terms, the Interim DIP Lender has agreed to provide the Debtors with the Interim DIP Facility in an amount up to $6,200,000.00 for the purpose of allowing the BRON Group to meet its immediate cash needs during the pendency of the CCAA Proceeding.

**D.**     **Recognition as a Foreign Main Proceeding**

19.     I am informed that in order to be recognized as a "foreign main proceeding," a proceeding must be pending in the country where the debtor has its "center of main interests," which I understand to be the functional equivalent of a headquarters, principal place of business or "nerve center". I believe that the CCAA Proceeding meets this requirement. As described below, all of the Debtors are headquartered in Canada where all of their executive and strategic functions occur and where management of the Debtors is located.

20.     Each of the BRON Parents is duly incorporated under the law of British Columbia, its registered office is in British Columbia, and its principal place of business is located at 1700-Park Place, 666 Burrard Street, Vancouver, British Columbia (the "Head Office").

21.     The primary management and business operations of the Debtors were conducted from the Head Office with all of the Debtors' executive and senior management working at the Head Office. The Head Office acted as the "nerve center" of the business in that all accounting functions, strategic decision-making, communication functions, marketing and pricing decisions, new business development initiatives, negotiations of material contracts and leases, acquisition of equipment, and other key functions were coordinated and/or managed from the Head Office in British Columbia.

22.     In other words, as set forth below, Canada is where the Debtors' principal place of business and "nerve center" is located:

A.      The Debtors' headquarters and the location where general supervision and management of the Debtors takes place is British Columbia, Canada;

B.      All strategic and operational decisions for the Debtors, including the Debtors U.S. subsidiaries, are made in Canada;

C.      All accounting, purchasing and cash management functions for the Debtors occur in Canada;

D.      The Debtors' accounting, financing and other operational books and records are located in Canada;

E.      All corporate services for the Debtors, including tax support, legal services (excluding U.S. restructuring counsel and special counsel), and issuance of checks for accounts payable are rendered in British Columbia, Canada;

F.      All terms of employment and related policies and procedures for the Debtors' employees are established and directed out of the corporate headquarters in Canada;

G.      The Debtors' largest creditors are located in Canada under loan and other agreements, all of which are governed by the laws of Canada; and

H.     The ultimate shareholders of the Debtors are located in Canada.

23.    In sum, the business operations of the Debtors are all directed principally from its Head Office.  The key management of the BRON Group and all corporate-level decision-making and corporate administrative functions affecting the Debtors are centralized at the Head Office. Further, the BRON Parents, the ultimate parent entities of the Debtors, are duly incorporated under the laws of British Columbia and their registered office is in British Columbia.

24.    Based on these facts, I believe the Canadian Proceeding is a "foreign mam proceeding" as I have been advised that term is defined in Bankruptcy Code Sections 101(23) and 1502(4).  The CCAA Proceeding is pending in British Columbia, Canada.  Moreover, British Columbia is the "center of main interests" for the Debtors.

A.     **Need for Provisional Relief**

25.    In addition to seeking recognition on a final basis, the Foreign Representative also requests certain provisional relief.  Pending recognition of the CCAA Proceeding, the Foreign Representative seeks provisional relief to enjoin collection efforts against the Debtors and their assets, as well as to protect potentially valuable contractual relationships.  This relief is necessary to avoid immediate and irreparable harm to the Debtors and their assets if U.S. creditors and contract parties begin a "race to the courthouse" or resort to other self-help remedies resulting in a piece-meal and preferential liquidation and distribution of assets, rather than an orderly realization and distribution of value according to legal priorities.

26.    It is also necessary for all actions against the Debtors' directors and officers, in their capacity as such, to be stayed on a provisional basis.  The Debtors' directors and officers are essential to managing the Debtors' business and ability to implement a successful restructuring.

Moreover, the Debtors' directors and officers have indemnification rights and have been granted a charge against the Debtors pursuant to the Initial Order.

27.     As indicated by the 13-week cash flow projections, attached hereto as **Exhibit 1,** the Debtors cannot operate unless additional, immediate funding is provided through the Interim DIP Facility. The funding provided by the Interim DIP Facility (defined below) is therefore necessary to give vendors, employees and other critical parties who deal with the Debtors confidence that the Debtors have access to funds to meet their post-filing obligations to such parties.

28.     To provide the necessary funding to sustain operations, the Debtors have entered into an interim facility (the "Interim DIP Facility") pursuant to the terms of DIP Loan Agreement between the Debtors, as borrowers, and Interim DIP Lender, as the lender.

29.     The Interim DIP Lender has agreed to provide the Interim DIP Facility upon the terms outlined in the DIP Loan Agreement attached hereto as **Exhibit 2.** The terms of the DIP Loan Agreement were negotiated, proposed and entered into by the Debtors and the Interim DIP Lender without collusion, in good faith and at arm's length.

30.     The Foreign Representative further requests provisional relief to grant the Interim DIP Lender certain protections under the Bankruptcy Code. This relief is necessary to prevent the Interim DIP Lender from refusing the Debtors access to the interim financing approved by the Canadian Court. Without the protections afforded to the Interim DIP Lender under the Bankruptcy Code, there is a material risk that the Debtors will be unable to obtain the requisite financing to continue their business operations and fund their restructuring proceedings, which will significantly impair and potentially result in irreparable damage to the value of the Debtors'

assets.

31.     This provisional relief is consistent with the Initial Order, which, among other things, stays all creditor collection actions against the Debtors, their assets and their directors and officers (paragraphs 15 & 22), prohibits contract counterparties from terminating contracts with the Debtors (paragraph 20), authorizes the Debtors to enter into and perform under the Interim DIP Facility and grants the Interim DIP Lender a charge in connection therewith (paragraphs 35-38), grants the Debtors' directors and officers a charge against the Debtors' assets for the Debtors' indemnification obligations owed to the directors and officers (paragraph 24), and grants the Monitor, the Monitor's professionals and the Debtors' (including the Foreign Representative's) professionals and advisors a charge for professional fees and expenses incurred in connection with the CCAA Proceeding and Chapter 15 Cases (paragraph 34).

32.     For the foregoing reasons, I believe that the provisional relief requested is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

**E.          Noticing Procedures**

33.     The Foreign Representative has also filed a motion requesting that the Court schedule a final recognition hearing and approval of related noticing procedures (the "Notice Procedures Motion"). I can attest that the Debtors have numerous creditors, potential creditors, and other parties in interest, all of whom need to be provided with, among other things, notice of the entry of the provisional order, the proposed final order, the recognition objection deadline, and the recognition hearing. The Foreign Representative has prepared a form of notice advising of these and related matters (the "Recognition Hearing Notice"), a copy of which is annexed to the *Motion of Foreign Representative for Order (I) Scheduling Hearing on Verified Petition Under*

*Chapter 15 of The Bankruptcy Code For Recognition of a Foreign Main Proceeding and for*
*Additional Relief and Assistance Under 11 U.S.C. §§105(a), 1507, and 1521 and (II) Specifying*
*Form and Manner of Service of Notice of Hearing* (the "Notice Procedures Motion").

34.    Under the facts and circumstances of the Debtors' Chapter 15 Cases, I submit that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide those parties identified as the Notice Parties in the Notice Procedures Motion with due and sufficient notice of the relief requested in the Recognition and Relief Motion and associated objection deadlines and hearing dates.

35.    Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

**B.        Joint Administration and Consolidated Rule 1007(a)(4) List**

36.    The Foreign Representative has also filed, contemporaneously herewith, a motion seeking entry of an order directing joint administration of these Chapter 15 Cases for procedural purposes only and authorizing the Foreign Representative to consolidate and maintain a list (the "Consolidated 1007(a)(4) List") of foreign proceeding administrators, parties to litigation pending in the United States involving the Debtors, if any, and all persons and entities against whom the Debtors seek provisional relief pursuant to Section 1519 of the Bankruptcy Code.

37.    I believe that joint administration of these Chapter 15 Cases is warranted because the Debtors' financial affairs and business operations are closely related, and because it will ease the administrative burden of these cases on the Court and interested parties. I can confirm that the Foreign Representative anticipates that the various notices, motions, hearings,

orders, and other pleadings in these cases will affect all of the Debtors.

38.    I believe that the relief requested with respect to the Consolidated 1007(a)(4) List is also necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest  As the provisional and final relief sought in each of these cases is substantially similar, and any additional relief sought is likely to impact most or all of the Debtors, most, if not all, motions, notices, hearings, orders and other papers filed in these cases will likely affect most or all of the Debtors.  Under these circumstances, filing and maintaining separate lists under Bankruptcy Rule 1007(a)(4) would result m unnecessary confusion and wasteful duplication of effort and service.

[SIGNATURE APPEARS ON THE FOLLOWING PAGE]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 20, 2023


/s/ *Aaron L. Gilbert*
Aaron L. Gilbert

**Exhibit 1**

**<u>Cash Flow Projections</u>**

**BRON MEDIA GROUP ("Bron")**
**Consolidated Cash Flow Forecast**
**July 19, 2023 to October 18, 2023 (the "Cash Flow Period")**

| For the week ending, In USD | Notes | Forecast Week 1 26-Jul-23 | Forecast Week 2 02-Aug-23 | Forecast Week 3 09-Aug-23 | Forecast Week 4 16-Aug-23 | Forecast Week 5 23-Aug-23 | Forecast Week 6 30-Aug-23 | Forecast Week 7 06-Sep-23 | Forecast Week 8 13-Sep-23 | Forecast Week 9 20-Sep-23 | Forecast Week 10 27-Sep-23 | Forecast Week 11 04-Oct-23 | Forecast Week 12 11-Oct-23 | Forecast Week 13 18-Oct-23 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Receipts** | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll Expense | 3 | | | | | | | | | | | | | | |
| BRON Media | | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | 415,253 |
| BRON Animation | | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | 362,445 |
| BRON Studios | | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | 238,133 |
| BRON Studios USA | | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | 426,058 |
| BRON Digital USA | | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | 262,907 |
| BRON Digital USA (Interactive Group) | | 38,282 | - | 38,282 | - | 38,282 | - | 38,282 | - | 38,282 | - | 38,282 | - | - | 267,974 |
| KERP | 4 | - | - | - | - | - | - | - | - | - | - | - | - | 234,425 | 234,425 |
| Source Deductions | 5 | 665,851 | - | - | - | - | - | - | - | - | - | - | - | - | 665,851 |
| Notice Period Employees | 6 | - | - | 158,341 | - | - | - | - | - | - | - | - | - | - | 158,341 |
| Total Payroll Expense | | 947,675 | - | 440,165 | - | 281,824 | - | 281,824 | - | 281,824 | - | 281,824 | - | 516,249 | 3,031,385 |
| Other Operating Expenses | 7 | | | | | | | | | | | | | | |
| Rent | 8 | 116,653 | - | - | - | 36,041 | - | - | - | - | - | 36,041 | - | - | 188,735 |
| Software | 9 | 58,246 | - | - | - | 33,046 | - | 11,547 | 3,877 | - | - | 33,046 | - | 21,391 | 161,154 |
| Interest | 10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Selling, General & Administration | 11 | 6,820 | 9,579 | 6,199 | 49,095 | 6,820 | 9,579 | 49,095 | 6,199 | 58,674 | 6,820 | 9,579 | 6,199 | 49,095 | 273,754 |
| Other Operating Expenses | | 181,719 | 9,579 | 6,199 | 49,095 | 75,907 | 9,579 | 60,642 | 10,076 | 58,674 | 75,907 | 9,579 | 6,199 | 70,486 | 623,643 |
| **Total Operating Disbursements** | | **1,129,395** | **9,579** | **446,364** | **49,095** | **357,732** | **9,579** | **342,466** | **10,076** | **340,498** | **75,907** | **291,403** | **6,199** | **586,735** | **3,655,029** |
| Net Cashflow From Operations | | (1,129,395) | (9,579) | (446,364) | (49,095) | (357,732) | (9,579) | (342,466) | (10,076) | (340,498) | (75,907) | (291,403) | (6,199) | (586,735) | (3,655,029) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Bron Legal Counsel Fees | 12 | 113,688 | 75,792 | 75,792 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 833,712 |
| Proposed Monitor Fees | | 75,792 | 75,792 | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | 606,336 |
| Monitor Catch up Fees | | 121,267 | - | - | - | - | - | - | - | - | - | - | - | - | 121,267 |
| Proposed Monitor's Legal Counsel Fees | | - | 75,792 | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | 530,544 |
| Proposed Monitor's Legal Counsel Catch up Fees | | 26,527 | - | - | - | - | - | - | - | - | - | - | - | - | 26,527 |
| US Legal Fees and US Filing Fees | 13 | 190,000 | - | - | - | - | - | - | - | - | - | 85,000 | - | - | 275,000 |
| UK Legal Fees | 14 | 75,792 | - | - | - | - | - | - | - | - | - | - | - | - | 75,792 |
| DIP Financing Fees | | 18,948 | - | - | - | 18,948 | - | - | - | 18,948 | - | - | - | 18,948 | 75,792 |
| CCAA Professional Fees | | 622,015 | 227,376 | 227,376 | 56,844 | 227,376 | 56,844 | 208,428 | 56,844 | 227,376 | 56,844 | 293,428 | 56,844 | 227,376 | 2,544,971 |
| **Total Disbursements** | | **1,751,409** | **236,955** | **673,740** | **105,939** | **585,108** | **66,423** | **550,894** | **66,920** | **567,874** | **132,751** | **584,831** | **63,043** | **814,111** | **6,200,000** |
| Net Cashflow | | (1,751,409) | (236,955) | (673,740) | (105,939) | (585,108) | (66,423) | (550,894) | (66,920) | (567,874) | (132,751) | (584,831) | (63,043) | (814,111) | (6,200,000) |
| **DIP Financing** | | | | | | | | | | | | | | | |
| DIP Financing Advances | | 1,751,409 | 236,955 | 673,740 | 105,939 | 585,108 | 66,423 | 550,894 | 66,920 | 567,874 | 132,751 | 584,831 | 63,043 | 814,111 | 6,200,000 |
| **Ending Cash Balance** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cumulative DIP Financing | | 1,751,409 | 1,988,364 | 2,662,105 | 2,768,044 | 3,353,151 | 3,419,575 | 3,970,469 | 4,037,389 | 4,605,263 | 4,738,015 | 5,322,846 | 5,385,889 | 6,200,000 | 6,200,000 |

**BRON MEDIA GROUP ("Bron")**
**Notes to the Cash Flow Forecast**
**July 19, 2023 to October 18, 2023 (the "Cash Flow Period")**

**Disclaimer**
1. This Cash Flow Forecast is prepared by Bron in accordance with s. 23(1)(b) of the Companies Creditors' Arrangement Act ("CCAA").
2. Bron has prepared this Forecast on probable and hypothetical assumptions that reflect the Bron's planned course of action for the period of 13 weeks. Management is of the opinion that, as at the date of filing the Cash Flow Forecast, the assumptions used to develop the projection represent the most probable set of economic conditions facing Bron and that the assumptions used proved a reasonable basis for and are consistent with the purpose of this Cash Flow Forecast.
3. The Cash Flow Forecast has been prepared by Bron and has been reviewed by the Proposed Monitor. The Proposed Monitor has not verified or confirmed certain expenses incurred by Bron which are reflected in this Cash Flow Forecast.
4. The information contained in this Cash Flow Forecast is subject to changing assumptions and/or with the receipt of new or additional information this actual results may vary. This Cash Flow Forecast should not be used for any other purpose than its stated purpose, and creditors are cautioned that the information provided in this Cash Flow Forecast could vary based on changing future circumstances.

**Note 1**
The Cash Flow Forecast assumes there will be no material opening cash balance.

**Note 2**
Bron advises that there will be no corporate receipts during the Cash Flow Period.

**Note 3**
Payroll expense assumes Bron reduces headcount and production of the Digital Projects is placed on hold. Work will continue on Bron's Fortnite rollout under the Interactive Group.

**Note 4**
Bron advises that it intends to seek a Key Employee Retention Plan ("KERP") in the CCAA proceedings.

**Note 5**
Pursuant to an agreement between the Companies and CWM, amounts relate to outstanding source deductions in respect of payroll, withholding taxes and dues for government programs, but does not include amounts relating to source deductions for the last pay period.

**Note 6**
Bron advises that it terminated a number of employees in June 2023. The Cash Flow Forecast includes amounts to be paid to these employees as they work their respective notice periods. Bron has not provided a breakdown of these amounts by employee to date.

**Note 7**
Operating expenses assume a CCAA filing with pre-filing amounts stayed, other than as disclosed in Note 11. Critical supplier payments are included, but are not material.

**Note 8**
Rent is for studios in Los Angeles and Burnaby. Bron advises that it intends to disclaim its Los Angeles lease and move to a smaller facility in Los Angeles as part of its restructuring. The Los Angeles lease is CAD $111,564 monthly so rent expense may decrease during the Cash Flow Period. Bron has yet to provide a projected cost for the replacement Los Angeles studio.

**Note 9**
Software is Zoom, Microsoft, Vision 33 (accounting), Bamboo (HR) and others necessary for Bron's operations during the Cash Flow Period. The amounts also include licence renewal fees.

**Note 10**
The Cash Flow Forecast assumes that interest on existing loans will be accrued during the Cash Flow Period.

**Note 11**
SG&A includes employee benefits payments. The Cash Flow Forecast assumes that pre-filing employee benefits will be paid.

**Note 12**
Bron Legal Counsel Fees assumes no material costs in regard to litigation in connection with the orders sought in Canada during the CCAA proceeding, however does assume fees in recognition of litigation in the US.

**Note 13**
The Cash Flow Forecast assumes that there will be Chapter 15 bankruptcy proceedings in the US in conjunction with the CCAA proceedings. The $190,000 reflected in week one is required by legal counsel upon approval of the initial CCAA Order.

**Note 14**
The Cash Flow Forecast assumes that there will be UK recognition orders.

**Tuesday, July, 18, 2023**

**Bron Media Group**

Per: _____
**Dave Whitney, Chief Financial Officer**

**Grant Thornton Limited, as Proposed Monitor**

Per: _____
**Mark Wentzell, CPA, CA, CIRP, LIT, Senior Vice President**

**Exhibit 2**

**<u>DIP Loan Agreement</u>**

## DIP LOAN AGREEMENT

### Dated as of July 18, 2023

**WHEREAS** the Borrowers (as defined below) have requested that the DIP Lender (as defined below) provide financing to fund certain obligations of the Borrowers in the context of their anticipated proceedings under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**", and such proceeding, the "**CCAA Proceedings**") before the Supreme Court of British Columbia (the "**Canadian Court**") and the anticipated recognition of the CCAA Proceedings by the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "**US Court**" and together with the Canadian Court, the "**Courts**") under Chapter 15 of the United States Bankruptcy Code (the "**Chapter 15 Proceedings**") and, if determined necessary, in the sole discretion of the DIP Lender, recognition of the CCAA Proceedings in a court of competent jurisdiction in the United Kingdom (together with the CCAA Proceedings and the Chapter 15 Proceedings, the "**Insolvency Proceedings**") in accordance with the terms and conditions set out in this agreement (this "**DIP Agreement**");

**NOW THEREFORE** the parties, in consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are hereby acknowledged), agree as follows:

| | | |
|---|---|---|
| 1. | **BORROWERS:** | All of the entities listed in **Schedule "A"** hereto (collectively, the "**Borrowers**"), acting jointly and severally. |
| 2. | **DIP LENDER:** | Creative Wealth Media Lending LP 2016 in respect of the DIP Facility (in such capacity, the "**DIP Lender**"). |
| 3. | **PURPOSE:** | As set out in Section 15(d) of this DIP Agreement. |
| 4. | **DIP FACILITY AND MAXIMUM AMOUNT** | A super-priority, debtor-in-possession, non-revolving credit facility (the "**DIP Facility**") up to the maximum principal amount of $6,200,000.00 (the "**Maximum Amount**"). For greater certainty, any interest, expenses or fees that are capitalized and added to the principal amount owing hereunder as contemplated by the terms hereof shall not constitute part of the Maximum Amount, and the Borrowers are and shall be permitted to borrow up to the Maximum Amount without taking into account any such capitalized amounts, subject to the terms and conditions hereof. |
| | | Advances under the DIP Facility shall be made in accordance with Section 7 of this DIP Agreement. |
| 5. | **REPAYMENT:** | The aggregate principal amount owing under the DIP Facility, all accrued and unpaid interest, all fees and expenses incurred by the DIP Lender (including, without limitation, the Expenses (as defined below)), and all other obligations of the Borrowers to the DIP Lender under or in connection with the Insolvency |

Proceedings, this DIP Agreement, the DIP Facility or any other definitive security or other documents, agreements, registrations, financing statements and instruments in respect of the DIP Facility (collectively, the **"DIP Obligations"**) shall be repaid in full on the earliest to occur of: (i) the occurrence of any Event of Default hereunder that has not been cured or waived in writing by the DIP Lender, in its sole discretion; (ii) the closing of one or more sale transactions for all or substantially all of the assets or shares in the capital of the Borrowers approved by an order of the Canadian Court, including in connection with the SISP (as defined below); (iii) the implementation of a plan of compromise or arrangement in accordance with the CCAA and the Court Orders (as defined below); (iv) conversion of the CCAA Proceedings into a proceeding under the *Bankruptcy and Insolvency Act* (Canada); and (v) October 18, 2023 (the earliest of such dates being the **"Maturity Date"**). Provided that there is no Event of Default hereunder which is continuing, the Maturity Date may be extended at the request of the Borrowers, following consultation with the Monitor, and with the prior written consent of the DIP Lender, in its sole discretion, for such period and on such terms and conditions as the Borrowers and the DIP Lender may agree.

The commitment in respect of the DIP Facility shall expire automatically on the Maturity Date (unless extended according to the terms hereunder) and all DIP Obligations shall be repaid in full on the Maturity Date (or extended Maturity Date), without the DIP Lender being required to make demand upon the Borrowers or to give notice that the DIP Facility has expired and/or that the DIP Obligations are due and payable.

All payments received by the DIP Lender shall be applied first to any fees and expenses due hereunder (including, without limitation, the Expenses), then to accrued and unpaid interest and then, after all such fees, expenses and interest are brought current, to principal.

It is acknowledged that some or all of the DIP Obligations may be satisfied by the DIP Lender "credit bidding" such DIP Obligations for some or all of the assets of the Borrowers pursuant to the SISP to be implemented in the CCAA Proceedings, in the DIP Lender's sole discretion.

**6.    CASH FLOW PROJECTIONS:**

The Borrowers, in consultation with Grant Thornton Limited, in its capacity as proposed court-appointed monitor (as appointed in such capacity, the **"Monitor"**) in the CCAA

Proceedings, have provided to the DIP Lender the cash flow projections attached at **<u>Schedule "B"</u>** hereto, which are in form and substance satisfactory to the DIP Lender and which are to be filed with the Canadian Court, reflecting the projected cash requirements of the Borrowers for the 13-week period from July 26, 2023, through the period ending October 18, 2023, calculated on a weekly basis (the "**Cash Flow Projection**").

The Borrowers shall keep the DIP Lender and the Monitor apprised of their cash flow requirements by providing: (i) an updated cash flow projection for the same period as the Cash Flow Projection by no later than 5:00 p.m. (Vancouver time) on the Wednesday of each week ending after the week in which the First DIP Advance (as defined below) occurs, such updated cash flow projection to be in a form consistent with the Cash Flow Projection (a "**Proposed Amended Cash Flow Projection**"), provided that the Borrowers, at their option, may provide a Proposed Amended Cash Flow Projection on a more frequent basis, but in any event, not more than twice in any calendar week; and (ii) on a weekly basis, (x) actual cash flow results from the immediately preceding one week period and (y) a comparison of the actual cash flow results from the immediately preceding one week period as against the DIP Agreement Cash Flow Projection (as defined below) for such week, such information described in this clause (ii) to be delivered to the DIP Lender and Monitor weekly by no later than 5:00 p.m. (Vancouver time) on the Wednesday of each week.

No Proposed Amended Cash Flow Projection shall be considered the DIP Agreement Cash Flow Projection unless the DIP Lender has provided notice in writing to the Borrowers, with a copy to the Monitor, confirming its consent to such Proposed Amended Cash Flow Projection. Upon the DIP Lender delivering such notice to the Borrowers, with a copy to the Monitor, such Proposed Amended Cash Flow Projection shall be considered the DIP Agreement Cash Flow Projection.

At any given time, the cash flow projection in force and effect (whether the Cash Flow Projection or any subsequent Proposed Amended Cash Flow Projection which the DIP Lender has consented to in accordance herewith) shall be the "**DIP Agreement Cash Flow Projection**".

For greater certainty, neither the DIP Lender nor the Monitor, as the case may be, shall be required to initiate any DIP

Advances pursuant to a Proposed Amended Cash Flow Projection, nor are the Borrowers entitled to utilize any DIP Advance to make payments set out in a Proposed Amended Cash Flow Projection, unless and until it has become effective as the DIP Agreement Cash Flow Projection in accordance with this Section 6.

**7. ADVANCES UNDER DIP FACILITY:**

**I. DIP Advances from the DIP Lender**

Pursuant to the terms and conditions of this DIP Agreement, the DIP Lender shall advance the following disbursements as draws against the Maximum Amount of the DIP Facility:

(a)     A first advance in the amount of $665,000.00 ("**First DIP Advance**") shall be made by the DIP Lender to the Borrowers in accordance with Section 9 of this DIP Agreement, such First DIP Advance to be advanced following the satisfaction of each of the conditions to the First DIP Advance set out in Section 8 of this DIP Agreement;

(b)     A second advance in the amount of $1,086,409.00 ("**Second DIP Advance**") shall be made by the DIP Lender to the Borrowers in accordance with Section 9 of this DIP Agreement, such Second DIP Advance to be advanced following the satisfaction of each of the conditions to the Second DIP Advance set out in Section 8 of this DIP Agreement;

(c)     A third advance in the amount of $910,695.00 ("**Third DIP Advance**") shall be made by the DIP Lender to the Borrowers in accordance with Section 9 of this DIP Agreement, such Third DIP Advance to be advanced following the satisfaction of each of the conditions to the Third DIP Advance set out in Section 8 of this DIP Agreement; and

(d)     One or more subsequent advances (each, a "**Subsequent DIP Draw**" and together with the First DIP Advance, the Second DIP Advance and the Third DIP Advance, the "**DIP Advances**" and each a "**DIP Advance**") up to the aggregate principal amount $3,537,895.00 shall be made by the DIP Lender to the Monitor, in trust for the Borrowers, to be disbursed in accordance with Section 9 of this DIP Agreement, each such Subsequent DIP Draw to be advanced following the satisfaction of each of the conditions to such

Subsequent DIP Draw set out in Section 8 of this DIP Agreement.

## II.    Subsequent DIP Draws from the Monitor

Following the advance of the Third DIP Advance, the Borrowers shall apply to the DIP Lender and the Monitor to draw on proceeds available under the DIP Facility in accordance with the following process:

(a)    The Borrowers shall issue a request for Subsequent DIP Draw by delivering a draw down certificate, substantially in the form attached hereto as **Schedule "C"** to the DIP Lender, with a copy to the Monitor, which request shall specify the amount of Subsequent DIP Draw requested and shall identify the intended uses for such Subsequent DIP Draw in accordance with the DIP Agreement Cash Flow Projection; and

(b)    Subsequent DIP Draws shall be in the minimum principal amount of $100,000 and in increments of $100,000 and are to be funded within three (3) business days following delivery of the request for a Subsequent DIP Draw, unless within two (2) business days of delivery of such request for a Subsequent DIP Draw the DIP Lender (after consultation with the Monitor) delivers to the Borrowers a notice of non-consent to such Subsequent DIP Draw as a result of one or more of the applicable conditions precedent not being met or the occurrence of an Event of Default that is continuing and such notice shall include reasonable details outlining any such unsatisfied applicable condition precedent or Event of Default. The DIP Lender, in consultation with the Monitor, may also consent to the making of a Subsequent DIP Draw prior to the second (2nd) business day following delivery of the request for a Subsequent DIP Draw.

The proceeds of each DIP Advance shall be applied by the Borrowers solely in accordance with the DIP Agreement Cash Flow Projection, subject to the Permitted Variance (as defined below), or as may otherwise be agreed to in writing by the DIP Lender, in its sole discretion, from time to time.

Notwithstanding anything to the contrary herein, unless the DIP Lender consents in advance in writing, the Borrowers shall be prohibited from using the proceeds of any DIP Advance to

- 6 -

pay: (i) any expenses that are not of a type of expense that falls within an expense line-item contained in the DIP Agreement Cash Flow Projection, subject to the Permitted Variance (and for certainty including the exceptions contained therein); (ii) professional fees of the Borrowers or any other party to contest, challenge or in any way oppose (or support any other person in contesting, challenging or opposing) the DIP Lender on any Court Order; (iii) subject to the preceding subsection (ii), the professional fees of any party, except for such professional fees incurred for and on behalf of the Borrowers, the Monitor, the DIP Lender and the Existing Lenders (as defined below); and (iv) any amounts outstanding as at the date of commencement of the CCAA Proceedings, including without limitation, any amounts owing to trade creditors and other lenders.

For the purposes of this DIP Agreement, "**Permitted Variance**" shall mean an adverse variance of not more than 10% of the aggregate disbursements in the DIP Agreement Cash Flow Projection on a cumulative basis starting on the start date of the initial Cash Flow Projection referred to in the first paragraph of this Section 7 above; provided, however, that the Permitted Variance calculation shall not take into account (i) the Expenses, and (ii) the fees and expenses of Creative Wealth Media Finance Corp., Creative Wealth Media Lending LP 2016 and Creative Wealth Media Equity Fund I in their capacities as existing lenders to certain of the Borrowers (collectively, the "**Existing Lenders**").

**8.    CONDITIONS PRECEDENT TO DIP FACILITY ADVANCES**

**1.    CONDITIONS TO FIRST DIP ADVANCE**

The following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to the First DIP Advance hereunder:

(a)    The Canadian Court shall have issued an initial order in substantially the form attached as **Schedule "D"** hereto (the "**Initial Order**") on or before July 19, 2023, the effect of which, among other things, is to authorize and approve the DIP Facility on the terms and conditions hereof including without limitation the DIP Charge (as defined below) securing the principal amount of $1,751,409.00, plus interest fees and expenses payable pursuant to this DIP Agreement, and the other DIP Obligations not constituting the principal amount thereof with the priority contemplated herein, and such

- 7 -

Initial Order shall have been obtained on notice to such parties required by the DIP Lender;

(b)     The Borrowers shall have filed with the US Court a Petition for an Order Granting Provisional Relief to the Borrowers in a form acceptable to the DIP Lender in its sole discretion (the "**Provisional Relief Order**"), the effect of which shall be to, among other things, recognize the CCAA Proceedings and the Initial Order, and approve the DIP Facility and the DIP Charge, all on terms acceptable to the DIP Lender in its sole discretion;

(c)     Delivery to the DIP Lender, with a copy to the Monitor of a drawdown certificate, in substantially the form set out in **Schedule "C"** hereto, executed by an officer on behalf of the Borrowers, certifying, *inter alia*, that the proceeds of the First DIP Advance requested thereby will be applied solely (i) to pay Jones & Walden, LLC ("**JW**"), in its capacity as US counsel to the Borrowers, up to $190,000.00 in satisfaction of JW's costs and expenses incurred in connection with the preparation of the Chapter 15 Proceedings on or before 5:00 p.m. (Eastern Standard Time) on July 21, 2023 (the "**JW Payment**") and (ii) in accordance with the DIP Agreement Cash Flow Projection and Section 3 of this DIP Agreement, that the Borrowers are in compliance with the Court Orders, and that no Default or Event of Default has occurred or is continuing;

(d)     The Initial Order shall be in full force and effect and shall not have been vacated, stayed or otherwise caused to become ineffective, or amended in a manner prejudicial to the DIP Lender;

(e)     There is no Default or Event of Default that has occurred and is continuing, nor will any such event occur as a result of the First DIP Advance;

(f)     No material adverse change in the financial condition or operation of the Borrowers or otherwise affecting the Borrowers shall have occurred after the date hereof;

(g)     Each of the representations and warranties made in this DIP Agreement shall be true and correct in all material respects as of the date made or deemed made and as of the date of the First DIP Advance (unless any

representation and warranty is qualified by materiality, in which case it shall be true and correct in all respects as of the date made or deemed made);

(h)    There are no pending motions for leave to appeal, appeals, or injunctions relating to the Initial Order, the DIP Facility, the DIP Charge or this DIP Agreement, or pending litigation seeking to restrain, vary or prohibit the operation of all or any part of the Initial Order or this DIP Agreement;

(i)    The DIP Lender has received, as and when required hereunder, all information to which it is entitled hereunder (including, without limitation, the information and cash flow projections required pursuant to Section 6 of this DIP Agreement);

(j)    There shall be no liens ranking in priority to the DIP Charge except for the Admin Charge (as defined below) and the KERP Charge (as defined below) (if applicable);

(k)    The Borrowers shall have paid all government statutory liens, trusts and other claims arising after the commencement of the Insolvency Proceedings (but for greater certainty, not including any such claims in existence at the time of the commencement of the Insolvency Proceedings) including, without limitation, source deductions (including similar employee remittances in respect of employees in the United States and the United Kingdom, if applicable), except, in each case, for any such amounts that are not yet due and payable or which are in dispute; and

(l)    The Borrowers shall be in compliance with all Court Orders.

## 2.    CONDITIONS TO SECOND DIP ADVANCE

The following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to the Second DIP Advance hereunder:

(a)    The US Court shall have issued the Provisional Relief Order, the effect of which shall be to, among other things, recognize the CCAA Proceedings and the Initial Order, and approve the DIP Facility and the DIP

- 9 -

Charge, all on terms acceptable to the DIP Lender in its sole discretion;

(b)    Delivery to the DIP Lender, with a copy to the Monitor of a drawdown certificate, in substantially the form set out in **Schedule "C"** hereto, executed by an officer on behalf of the Borrowers, certifying, *inter alia*, that the proceeds of the Second DIP Advance requested thereby will be applied solely in accordance with the DIP Agreement Cash Flow Projection and Section 3 of this DIP Agreement, that the Borrowers are in compliance with the Court Orders, and that no Default or Event of Default has occurred or is continuing;

(c)    The Initial Order and the Provisional Relief Order shall be in full force and effect and shall not have been vacated, stayed or otherwise caused to become ineffective, or amended in a manner prejudicial to the DIP Lender;

(d)    There is no Default or Event of Default that has occurred and is continuing, nor will any such event occur as a result of the Second DIP Advance;

(e)    No material adverse change in the financial condition or operation of the Borrowers or otherwise affecting the Borrowers shall have occurred after the date hereof;

(f)    Each of the representations and warranties made in this DIP Agreement shall be true and correct in all material respects as of the date made or deemed made and as of the date of the Second DIP Advance (unless any representation and warranty is qualified by materiality, in which case it shall be true and correct in all respects as of the date made or deemed made);

(g)    There are no pending motions for leave to appeal, appeals, or injunctions relating to the Initial Order, the DIP Facility, the DIP Charge or this DIP Agreement, or pending litigation seeking to restrain, vary or prohibit the operation of all or any part of the Initial Order or this DIP Agreement;

(h)    The DIP Lender has received, as and when required hereunder, all information to which it is entitled hereunder (including, without limitation, the

information and cash flow projections required pursuant to Section 6 of this DIP Agreement);

(i)     There shall be no liens ranking in priority to the DIP Charge except for the Admin Charge and the KERP Charge (if applicable);

(j)     The Borrowers shall have paid all government statutory liens, trusts and other claims arising after the commencement of the Insolvency Proceedings (but for greater certainty, not including any such claims in existence at the time of the commencement of the Insolvency Proceedings) including, without limitation, source deductions (including similar employee remittances in respect of employees located in the United States and United Kingdom, if applicable), except, in each case, for any such amounts that are not yet due and payable or which are in dispute;

(k)     The Borrowers shall be in compliance with all Court Orders; and

(l)     The Borrowers shall have paid the JW Payment on or before 5:00 p.m. (Eastern Standard Time) on July 21, 2023.

## 3.     CONDITIONS TO THIRD DIP ADVANCE

The following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to the Third DIP Advance hereunder:

(a)     The Canadian Court shall have issued an amended and restated initial order in form and substance satisfactory to the DIP Lender in its sole discretion (the "**ARIO**") on or before July 29, 2023, the effect of which, among other things, is to authorize and approve the DIP Facility on the terms and conditions hereof including without limitation the DIP Charge securing the principal amount of $6,200,000.00 and the other DIP Obligations not constituting the principal amount thereof with the priority contemplated herein, and such ARIO shall have been obtained on notice to all parties entitled thereto pursuant to the CCAA or otherwise required by the DIP Lender;

(b)     The US Court shall have issued an Order Granting Additional Provisional Relief (the "**Additional**

**Provisional Relief Order**"), the effect of which shall be to, among other things, recognize the ARIO and approve the DIP Facility and the DIP Charge in accordance with the terms of the ARIO, all on terms acceptable to the DIP Lender in its sole discretion;

(c)     The Canadian Court shall have issued an order (the "**SISP Order**") approving a sales and investment solicitation process (the "**SISP**") on or before July 29, 2023, relating to the sale of all or substantially all of the assets of the Borrowers, which SISP Order and SISP shall be in a form and substance satisfactory to the DIP Lender in its sole discretion;

(d)     The ARIO, the SISP Order, the Additional Provision Relief Order and other Court Orders in the Insolvency Proceedings shall be in full force and effect and shall not have been vacated, stayed or otherwise caused to become ineffective or amended in a manner prejudicial to the DIP Lender;

(e)     Delivery to the DIP Lender, with a copy to the Monitor of a drawdown certificate, in substantially the form set out in **Schedule "C"** hereto, executed by an officer on behalf of the Borrowers, certifying, *inter alia*, that the proceeds of the Third DIP Advance requested thereby will be applied solely in accordance with the DIP Agreement Cash Flow Projection and Section 3 of this DIP Agreement, that the Borrowers are in compliance with the Court Orders, and that no Default or Event of Default has occurred or is continuing;

(f)     There is no Default or Event of Default that has occurred and is continuing, nor will any such event occur as a result of the Third DIP Advance;

(g)     No material adverse change in the financial condition or operation of the Borrowers or otherwise affecting the Borrowers shall have occurred after the date hereof;

(h)     Each of the representations and warranties made in this DIP Agreement shall be true and correct in all material respects as of the date made or deemed made and as of the date of the Third DIP Advance (unless any representation and warranty is qualified by materiality,

in which case it shall be true and correct in all respects as of the date made or deemed made);

(i)    The DIP Lender has received, as and when required hereunder, all information to which it is entitled hereunder (including, without limitation, the information and cash flow projections required pursuant to Section 6 of this DIP Agreement);

(j)    There are no pending motions for leave to appeal, appeals, or injunctions relating to the ARIO, the DIP Facility, the DIP Charge or this DIP Agreement, or pending litigation seeking to restrain, vary or prohibit the operation of all or any part of the ARIO or this DIP Agreement;

(k)    The Borrowers shall have paid all government statutory liens, trust and other claims arising after the commencement of the Insolvency Proceedings (but for greater certainty, not including any such claims in existence at the time of the commencement of the Insolvency Proceedings) including, without limitation, source deductions, except, in each case, for any such amounts that are not yet due and payable or which are in dispute;

(l)    There shall be no liens ranking in priority to the DIP Charge except for the Admin Charge and KERP Charge (if applicable);

(m)    All Expenses for which invoices have been provided to the Borrowers shall have been paid, or arrangements satisfactory to the DIP Lender shall have been made to pay such amounts; and

(n)    The Borrowers shall be in compliance with all Court Orders.

## 4.   CONDITIONS TO EACH SUBSEQUENT DIP DRAW

The following conditions precedent shall be satisfied, or waived in writing by the DIP Lender, in its sole discretion, prior to each Subsequent DIP Draw hereunder:

(a)    The ARIO, the SISP Order, the Additional Provisional Relief Order and other Court Orders in the Insolvency Proceedings shall be in full force and effect and shall

not have been vacated, stayed or otherwise caused to become ineffective or amended in a manner prejudicial to the DIP Lender;

(b)     Delivery to the DIP Lender, with a copy to the Monitor, of a drawdown certificate, in substantially the form set out in **Schedule "C"** hereto, executed by an officer on behalf of the Borrowers, certifying, *inter alia*, that the proceeds of the Subsequent DIP Draw requested thereby will be applied solely in accordance with the DIP Agreement Cash Flow Projection and Section 3 of this DIP Agreement, that the Borrowers are in compliance with the Court Orders, and that no Default or Event of Default has occurred or is continuing;

(c)     At the time the Subsequent DIP Draw is requested, the current employees and contractors of each of the Borrowers, including senior management, are satisfactory to the DIP Lender in its sole discretion;

(d)     There is no Default or Event of Default that has occurred and is continuing, nor will any such event occur as a result of the Subsequent DIP Draw;

(e)     No material adverse change in the financial condition or operation of the Borrowers or otherwise affecting the Borrowers shall have occurred after the date hereof;

(f)     Each Subsequent DIP Draw (together with all previous DIP Advances) must be no greater in the aggregate than the Maximum Amount and shall be subject to the terms and conditions hereof;

(g)     Each of the representations and warranties made in this DIP Agreement shall be true and correct in all material respects as of the date made or deemed made and of the date of each Subsequent DIP Draw (unless any representation and warranty is qualified by materiality, in which case it shall be true and correct in all respects as of the date made or deemed made);

(h)     The DIP Lender has received, as and when required hereunder, all information to which it is entitled hereunder (including, without limitation, the information and cash flow projections required pursuant to Section 6 of this DIP Agreement);

- 14 -

    (i)    There are no pending motions for leave to appeal, appeals, or injunctions relating to the DIP Facility, any Court Orders, the DIP Charge or this DIP Agreement, or pending litigation seeking to restrain, vary or prohibit the operation of all or any part of any Court Orders or this DIP Agreement;

    (j)    There shall be no liens ranking in priority to the DIP Charge except for the Admin Charge and KERP Charge (if applicable);

    (k)    The Borrowers shall have paid all government statutory liens, trust and other claims arising after the commencement of the Insolvency Proceedings (but for greater certainty, not including any such claims in existence at the time of the commencement of the Insolvency Proceedings) including, without limitation, source deductions (including similar employee remittances in respect of employees in the United States and the United Kingdom, if applicable), except, in each case, for any such amounts that are not yet due and payable or which are in dispute;

    (l)    The Borrowers shall have diligently and in good faith implemented and be conducting or have conducted, as applicable, the SISP in accordance with the SISP Order;

    (m)    All Expenses for which invoices have been provided to the Borrowers shall have been paid, or arrangements satisfactory to the DIP Lender shall have been made to pay such amounts; and

    (n)    The Borrowers shall be in compliance with all Court Orders.

Notwithstanding the foregoing or any other provision of this DIP Agreement, to the extent that an emergency cash need arises in the Borrowers' business that is not contemplated in the DIP Agreement Cash Flow Projection, the Borrowers may request a Subsequent DIP Draw from the DIP Lender by providing written particulars relating to such emergency cash need to the DIP Lender and the Monitor, which Subsequent DIP Draw shall only be permitted with the prior written consent of the DIP Lender delivered to the Borrowers and the Monitor, in the DIP Lender's sole and absolute discretion, and

provided further that in no case shall the Maximum Amount be exceeded.

**9.    DISBURSEMENTS**    The proceeds of the First DIP Advance, the Second DIP Advance and the Third DIP Advance shall be funded by the DIP Lender into the Borrowers' account noted in **Schedule "E"** hereto (the "**Borrowers' Account**").

The proceeds of each Subsequent DIP Draw shall be funded by the DIP Lender into a segregated trust account to be established and maintained by the Monitor (the "**Monitor's Trust Account**") solely for the purpose of administering DIP Advances in accordance with the terms of this DIP Agreement and the Court Orders of the Courts issued in the Insolvency Proceedings from time to time.  The proceeds of each Subsequent DIP Draw shall be held in trust by the Monitor in the Monitor's Trust Account, to be disbursed solely in accordance with the terms of this DIP Agreement and the Court Orders of the Courts issued in the Insolvency Proceedings from time to time.

The Monitor shall provide the DIP Lender with account details for the Monitor's Trust Account in writing no less than three (3) business days prior to each Subsequent DIP Draw.

The proceeds of each Subsequent DIP Draw shall be deposited by the Monitor by way of direct deposit to the Borrowers' Account.

**10.    VOLUNTARY PREPAYMENTS:**    The Borrowers may prepay the DIP Obligations at any time prior to the Maturity Date by effecting payment to the DIP Lender, to an account to be specified in writing in advance, in minimum amounts of $500,000 and in increments of $100,000 in excess thereof, without premium or penalty, and any amounts so prepaid may not be re-borrowed by the Borrowers hereunder.

**11.    INTEREST RATE:**    The outstanding principal amount of all DIP Advances shall bear interest from the date of advance at a rate per annum equal to 15% (the "**Interest Rate**"), and upon the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased by an additional 2% per annum, payable monthly in arrears on the last business day of each calendar month.

The Borrowers shall pay interest on all DIP Advances by adding such accrued interest to the principal amount of the DIP

Obligations on the last business day of each calendar month. Amounts representing the interest payable hereunder that are added to the principal amount of the DIP Obligations shall thereafter constitute principal and bear interest in accordance with this Section 11.

Interest on all DIP Advances shall accrue daily from and after the date of such DIP Advance to the Borrowers or the Monitor, as the case may be, to, but excluding, the date of repayment, as well as before and after maturity, demand and default and before and after judgment, and shall be calculated and compounded on a daily basis on the principal amount of such advances and any overdue interest remaining unpaid from time to time and on the basis of the actual number of days elapsed in a year of 365 days.

For the purposes of the *Interest Act* (Canada), the annual rates of interest referred to in this DIP Agreement calculated in accordance with the foregoing provisions of this DIP Agreement, are equivalent to the rates so calculated multiplied by the actual number of days in a calendar year and divided by 365 or 366, as the case may be.

If any provision of this DIP Agreement or any ancillary document in connection with this DIP Agreement would obligate the Borrowers to make any payment of interest or other amount payable to the DIP Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by the DIP Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by the DIP Lender of interest at a criminal rate and any such amounts actually paid by the Borrowers in excess of the adjusted amount shall be forthwith refunded to the Borrowers.

**12. DIP SECURITY:**   All of the DIP Obligations shall be secured by a Court-ordered charge (the "**DIP Charge**") over all present and after-acquired property, assets and undertakings of the Borrowers (including for greater certainty and without limitation, insurance proceeds, intellectual property, goods, documents of title, investment property, securities now owned or hereafter owned or acquired by or on behalf of the Borrowers and those assets set forth on the financial statements of the Borrowers),

including all proceeds therefrom and all causes of action of the Borrowers (collectively, the "**Collateral**").

The DIP Charge shall be a super-priority charge which shall rank ahead of all existing, liens, claims, trusts and charges, but shall be subject to and shall rank behind an administration charge (the "**Admin Charge**") in the maximum amount of $500,000.00 to secure payment of the fees, expenses and disbursements of: (i) the Borrowers' Canadian, US and, if determined necessary, in the sole discretion of the DIP Lender, UK counsel; (ii) the Monitor and its Canadian, US and, if determined necessary, in the sole discretion of the DIP Lender, UK counsel; and (iii) if necessary, a charge in an amount acceptable to the DIP Lender, in its sole discretion, to secure a key employee retention plan for certain of the Borrowers' critical employees (the "**KERP Charge**"). For greater certainty, the DIP Charge shall rank in priority to the following additional priority charges: (A) a charge in an amount not to exceed $724,000.00 in favour of the officers and directors of the Borrowers (the "**D&O Charge**") to secure the customary obligations and liabilities that they may incur in such capacity from and after the commencement of the Insolvency Proceedings as a backstop to any available directors' and officers' insurance and to the extent that any funds in trust for such persons are not sufficient to satisfy such claims; and (B) if necessary, a charge in an amount acceptable to the DIP Lender, in its sole discretion, to secure intercompany advances between certain of the Borrowers (the "**Intercompany Charge**").

**13.    MANDATORY REPAYMENTS:**

The proceeds of any debt or equity issuance by the Borrowers that occurs from and after the date hereof, and the proceeds of Collateral (for greater certainty, net of reasonable costs and closing adjustments, as applicable), including, without limitation, arising from: (a) any sale of Collateral out of the ordinary course of business (including for greater certainty, any sale of all or substantially all of the Collateral); or (b) insurance proceeds in respect of any damage, loss or destruction of the Collateral (collectively, the "**Net Proceeds**") shall be paid: (i) first, to satisfy the Admin Charge and KERP Charge (if applicable); (ii) second, to satisfy the DIP Obligations; (iii) third, to satisfy any other priority charges in accordance with their priorities; (iv) fourth, to satisfy other indebtedness and liabilities of the Borrowers as may be ordered by the Court in accordance with their priorities; and (v) fifth,

to the Borrowers or such other persons as are entitled thereto in accordance with applicable law.

The Maximum Amount shall be permanently reduced in an amount equal to the Net Proceeds paid to the DIP Lender and applied to the aggregate principal amount of the DIP Advances in accordance with Section 5 of this DIP Agreement. For greater certainty, any mandatory repayments shall not be subject to any premium or penalty.

**14. REPRESENTATIONS AND WARRANTIES:**

Each of the Borrowers jointly and severally represents and warrants to the DIP Lender, upon which the DIP Lender relies in entering into this DIP Agreement, that subject to the entry of the Initial Order and the Provisional Relief Order:

(a)    Each Borrower is a corporation duly incorporated and validly existing under the laws of its governing jurisdiction and is duly qualified, licensed or registered to carry on business under the laws applicable to it in all jurisdictions in which the nature of its assets or business makes such qualification necessary, except where the failure to have such qualification, license or registration would not have a Material Adverse Effect (as defined below).  For the purpose of this DIP Agreement, **"Material Adverse Effect"** means a material adverse effect on: (i) the financial condition, business or assets of the Borrowers; or (ii) the ability of the Borrowers to comply with their obligations hereunder or under any Court Order;

(b)    Subject to the granting of the Initial Order, the Provisional Relief Order, the ARIO and the Additional Provisional Relief Order, as the case may be, each Borrower has all requisite corporate or other power and authority to: (i) carry on its business; (ii) own property, borrow monies and enter into agreements therefor; and (iii) execute and enter into this DIP Agreement and observe and perform the terms and provisions hereof;

(c)    Subject to the granting of the Initial Order, the Provisional Relief Order, the ARIO or the Additional Provisional Relief Order, as the case may be, the execution and delivery of this DIP Agreement by each Borrower and the performance by each Borrower of its obligations hereunder has been duly authorized by all necessary corporate or other action and any actions required under applicable laws.  Except as has been

obtained and is in full force and effect, no registration, declaration, consent, waiver or authorization of, or filing with or notice to, any governmental body is required to be obtained in connection with the performance by the Borrowers of their obligations under this DIP Agreement;

(d)     Subject to the granting of the Initial Order, Provisional Relief Order, the ARIO or the Additional Provisional Relief Order, as the case may be, this DIP Agreement has been duly executed and delivered by each Borrower and constitutes a legal, valid and binding obligation of each Borrower, enforceable against it in accordance with its terms, subject only to any limitation under applicable laws relating to: (i) bankruptcy, insolvency, reorganization, moratorium or creditors' rights generally; (ii) the fact that specific performance and injunctive relief may only be given at the discretion of the courts; and (iii) the equitable or statutory powers of the courts to stay proceedings before them and to stay the execution of judgments;

(e)     The execution and delivery of this DIP Agreement by each Borrower and the performance by each Borrower of its obligations hereunder and compliance with the terms, conditions and provisions hereof, will not conflict with or result in a breach in any material respect of any of the terms, conditions or provisions of: (i) its constating documents (including any shareholders' agreements) or by-laws; (ii) any applicable laws; (iii) except as stayed pursuant to the Insolvency Proceedings by the terms of the Initial Order, the Provisional Relief Order, the ARIO or the Additional Provisional Relief Order, as the case may be, any contractual restriction binding on or affecting it or its material properties; or (iv) any material judgment, injunction, determination or award which is binding on it;

(f)     Each Borrower is in compliance with all applicable laws of each jurisdiction in which its business has been or is being carried on, non-compliance with which would reasonably be expected to have a Material Adverse Effect;

(g)     Unless previously disclosed or otherwise known to the DIP Lender or the Existing Lenders, to the Borrowers'

- 20 -

Knowledge (as defined below), there are no actions, suits or proceedings pending, taken or, threatened, before or by any governmental body or by any elected or appointed public official or private person in Canada or elsewhere, whether or not having the force of law, which would reasonably be expected to have a Material Adverse Effect and have not been stayed pursuant to the Insolvency Proceedings. For the purpose of this DIP Agreement "**Borrowers' Knowledge**" means the actual knowledge of the senior officers and directors of the Borrowers and the knowledge that such individuals would have had if they had conducted a reasonably diligent inquiry into the relevant subject matter;

(h)    The DIP Agreement Cash Flow Projection includes a provision for payment of all projected obligations of any kind whatsoever reasonably anticipated by the Borrowers on the date hereof that, if not paid, could result in statutory liens ranking in priority to the DIP Charge, except for purchase money security interests;

(i)    As at the date of the Initial Order, the Borrowers have good and marketable title to all of the Collateral;

(j)    Except as previously disclosed in writing by the Borrowers to the DIP Lender and set out on **Schedule "F"**, as at June 20, 2023, each Borrower has filed all material tax returns that are required to be filed and has in all material respects paid all taxes, interest and penalties, if any, which have become due pursuant to such returns or pursuant to any assessment received by it, except any such assessment that is being contested in good faith by proper legal proceedings. Without limiting the foregoing, all employee source deductions (including in respect of income taxes, employment insurance and Canada Pension Plan) payroll taxes and workers' compensation dues are currently paid and up to date, subject to normal course accruals, except as previously disclosed in writing by the Borrowers to the DIP Lender and set out on **Schedule "F"**;

(k)    Except as previously disclosed in writing by the Borrowers to the DIP Lender and set out on **Schedule "G"**, there are no actions, suits or proceedings (including any tax-related matter) by or before any arbitrator or governmental authority or by any other person pending against or threatened against or

affecting each Borrower that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect that have not been stayed pursuant to the Insolvency Proceedings;

(l)  Each Borrower maintains insurance policies and coverage that: (i) is sufficient for compliance with any applicable law and all material agreements to which it is a party; and (ii) provide adequate insurance coverage in at least such amounts and against at least such risks as are usually insured against in the same general area by persons engaged in the same or similar business to the assets and operations of such Borrower;

(m)  All factual information provided by or on behalf of each Borrower to the DIP Lender for the purposes of or in connection with this DIP Agreement or any transaction contemplated herein, is true and accurate in all material respects on the date as of which such information is dated or certified and remains true in all material respects as of the date provided and is not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided.  With respect to any projections, future business plans or forward looking financial statements, the Borrowers are not guaranteeing in giving this representation and warranty that the actual future results will be as forecast or projected (but, for greater certainty, the DIP Lender has all of its rights hereunder in the event that such actual future results are not as forecast or projected, including, without limitation, as provided for in Section 18(e) of this DIP Agreement); and

(n)  As of the date hereof, each Borrower does not administer any pension plans (for clarity, other than a "401k plan" in the United States) and does not have any outstanding payment obligations in respect of special payments or amortization payments, including without limitation, in respect of any pension plan, payments related to post-retirement benefits, solvency deficiencies or wind-up shortfalls in relation to any pension plan.

- 22 -

**15. AFFIRMATIVE COVENANTS:**

Each of the Borrowers jointly and severally covenants and agrees to do the following until such time as the DIP Obligations are indefeasibly repaid in full or otherwise satisfied through "credit bidding" pursuant to the SISP:

(a)    Keep the DIP Lender apprised on a timely basis of all material developments with respect to the Collateral and the business and affairs of the Borrowers;

(b)    Subject to the terms of the SISP and the SISP Order, keep the DIP Lender apprised on a timely basis of all material developments with respect to the SISP, and cause its legal counsel to do the same, including, without limitation, by providing copies of all offers (whether binding or not) to the DIP Lender;

(c)    Perform its obligations hereunder and under any other contract or agreement with the DIP Lender or any of its affiliates as and when required and in the manner required;

(d)    Use the proceeds of the DIP Facility (at all times solely in accordance with the terms hereof and the DIP Agreement Cash Flow Projections subject to the Permitted Variance) only for the limited purpose of facilitating the Insolvency Proceedings, including the SISP and for the purpose of funding: (i) transaction costs and expenses incurred by the DIP Lender in connection with the DIP Facility; (ii) professional fees and expenses incurred by the Borrowers, the Monitor and the DIP Lender in respect of the Insolvency Proceedings; and (iii) operating costs, expenses, capital expenditures and ordinary course liabilities (including, without limitation, wages, vacation pay and active employee benefits) of the Borrowers;

(e)    Comply with the provisions of the court orders made in connection with the Insolvency Proceedings (collectively, the "**Court Orders**" and each a "**Court Order**");

(f)    Preserve, renew and keep in full force the Borrowers' corporate or other existence and all material licenses, permits or approvals required in respect of their respective business, properties, assets or any activities or operations carried out therein;

- 23 -

(g)     Maintain the insurance in existence of the date hereof with respect to the Collateral;

(h)     Conduct its activities in accordance with the DIP Agreement Cash Flow Projection, subject to the Permitted Variance;

(i)     Promptly notify the DIP Lender and the Monitor of the occurrence of any Event of Default, or of any event or circumstance (a **"Default"**) that may, with the passage of time or the giving of notice, constitute an Event of Default;

(j)     Promptly notify the DIP Lender and the Monitor of the commencement of, or receipt of notice of intention to commence, any action, suit, investigation, litigation or proceeding before any court, governmental department, board, bureau, agency or similar body affecting the Borrowers;

(k)     Promptly after the same is available, but in no event later than the day that is three (3) business days prior to the date on which the same is to be served or if such advance notice is not possible then as soon as reasonably practicable prior to the date on which the same is to be served, provide copies to the DIP Lender of all pleadings, motion records, application records, judicial information, financial information and other documents filed by or on behalf of the Borrowers in the Insolvency Proceedings;

(l)     Subject to the CCAA and the Court Orders, comply in all material respects with all applicable laws, rules and regulations applicable to its business, including, without limitation, health and safety, and environmental laws;

(m)     With the consent of the DIP Lender, except where a stay of proceedings or Court Order otherwise applies, pay when due all government statutory liens, trust and other Crown claims including employee source deductions, outstanding source deductions owing by the Borrowers prior to the commencement of the Insolvency Proceedings in accordance with the Side Letter Agreement dated June 27, 2023 among certain of the Borrowers and Existing Lenders, GST, HST, PST, employer health tax, and workplace safety and

insurance premiums, but only with respect to: (i) payments that rank in priority to the DIP Charge; (ii) payments that are otherwise authorized pursuant to Court Order; or (iii) payments of commercial liability and directors' and officers' insurance premiums to maintain such insurance policies;

(n)    Treat as unaffected the DIP Obligations in any plan of compromise or arrangement, proposal or any other restructuring whatsoever;

(o)    At all times be and remain subject to the Insolvency Proceedings until the DIP Obligations are irrevocably and unconditionally repaid in full or otherwise satisfied through credit bidding pursuant to the SISP, with no further right to DIP Advances;

(p)    Ensure that all motion records, pleadings, application records, orders and other documents (collectively, the **"Court Documents"**) filed, proposed, sought, served, and obtained by the Borrowers or in respect of which the Borrowers consent or do not object, in or in connection with the Insolvency Proceeding shall be in form and substance reasonably satisfactory to the DIP Lender, and provide to the DIP Lender copies of such Court Documents as soon as practicable prior to any filing or service in the Insolvency Proceedings, but in no event later than the day that is three (3) business days prior to the date on which the same is to be served or if such advance notice is not possible then as soon as reasonably practicable prior to the date on which the same is to be served;

(q)    Subject to the Court Orders, grant the DIP Lender and its professional advisors reasonable access to the Collateral and their business, properties, and books and records; and

(r)    Conduct the SISP strictly in accordance with its terms (including milestones and timelines) and strictly comply with the SISP Order.

**16.    NEGATIVE COVENANTS:**    Each of the Borrowers jointly and severally covenants and agrees not to do the following or permit any subsidiary to do the following while any DIP Obligations remain outstanding,

other than with the prior written consent of the DIP Lender or pursuant to an Order of the Court:

(a)    Transfer, lease or otherwise dispose of all or any part of its property, assets or undertaking except: (i) where permitted pursuant to the Initial Order or ARIO; and (ii) where such transaction results in the repayment of DIP Obligations in accordance with Section 13 of this DIP Agreement;

(b)    Make any payment of principal or interest in respect of any indebtedness outstanding prior to Initial Order (**"Existing Indebtedness"**) other than as may be permitted or required herein or by a Court Order;

(c)    Create or permit to exist indebtedness for borrowed money other than: (i) Existing Indebtedness; (ii) debt contemplated by this DIP Facility; and (iii) post-filing trade credit obtained in the ordinary course of business, in accordance with the DIP Agreement Cash Flow Projection;

(d)    Permit any new liens to exist on any Collateral other than the Admin Charge, the KERP Charge (if applicable), the DIP Charge, the D&O Charge and the Intercompany Charge (if applicable);

(e)    Either: (i) change its name, amalgamate, consolidate with or merge into, or enter into any similar transaction with any other entity; or (ii) make any changes to its organizational documents that could be adverse to the DIP Lender;

(f)    Other than as permitted by the terms of this DIP Agreement, make any acquisitions, investments or loans to any person or guarantee the obligations of any person, other than those in existence on the date hereof and disclosed to the DIP Lender in writing;

(g)    Enter into any transaction with any affiliate other than: (i) any transaction on terms and conditions at least as favourable to the Borrowers as could reasonably be obtained in an arm's-length transaction; or (ii) those in existence on the date hereof and disclosed to the DIP Lender in writing;

(h)    Pay any dividends, distributions or advances to shareholders of the Borrowers, or any management

bonus or similar payments except to the extent provided for in the DIP Agreement Cash Flow Projection;

(i)    Engage in new businesses;

(j)    Change its fiscal year or accounting practices;

(k)    Issue any equity;

(l)    Take any action (or in any way support the taking of any action by another person) that has, or may have, a material adverse impact on the rights and interests of the DIP Lender, including, without limitation, any action in furtherance of challenging the validity, enforceability or amount of the DIP Obligations; and

(m)    Except in accordance with the SISP Order, commence, continue or seek any stakeholder or court approval for any sale, restructuring transaction or plan without the prior written consent of the DIP Lender in its sole discretion.

**17.   INDEMNITY AND RELEASE:**

The Borrowers agree to indemnify and hold harmless the DIP Lender, the Existing Lenders and each of their respective directors, officers, employees, partners, agents, attorneys, advisors and affiliates (all such persons and entities being referred to hereafter as **"Indemnified Persons"**, and each, an **"Indemnified Person"**) from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities or expenses of any kind or nature whatsoever (excluding indirect or consequential damages and claims for lost profits) which may be incurred by or asserted against or involve any Indemnified Person as a result of or arising out of or in any way related to or resulting from the Insolvency Proceedings, this DIP Agreement or any advance made hereunder, and, upon demand, to pay and reimburse any Indemnified Person for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding (including, without limitation, any inquiry or investigation) or claim (whether or not any Indemnified Person is a party to any action or proceeding out of which any such expenses arise); provided, however, the Borrowers shall not be obligated to indemnify pursuant to this paragraph any Indemnified Person against any loss, claim, damage, expense or liability to the extent it resulted from the gross negligence or willful misconduct of such Indemnified

Person as finally determined by a court of competent jurisdiction. For the avoidance of doubt, this indemnity does not apply to fees and costs, including legal fees, incurred by the Existing Lenders in connection with existing suits, actions or litigation in Canada and the United States in which the Existing Lenders (or any one of them) are co-defendants with the Borrowers.

The indemnities granted under this DIP Agreement shall survive any termination of the DIP Facility.

The Borrowers shall not contest, challenge or in any way oppose (or support any other person in contesting, challenging or opposing) the validity and enforceability of the DIP Obligations or any loan, security or other documents relating thereto. The Borrowers further covenant to, and do hereby, release the DIP Lender solely in its capacity as lender hereunder and its respective predecessors, successors, agents, advisors, representatives and assigns of and from all claims and liabilities relating to any act or omission related to this DIP Agreement that occurred prior to the date of this DIP Agreement.

**18.   EVENTS OF DEFAULT:**

The occurrence of any one or more of the following events, without the prior written consent of the DIP Lender, shall constitute an event of default ("**Event of Default**") under this DIP Agreement:

(a)     The issuance of any order terminating the CCAA Proceedings or the Chapter 15 Proceedings, or lifting the stay in the CCAA Proceedings or the Chapter 15 Proceedings to permit the enforcement of any security against any of the Borrowers or the Collateral (being Collateral with an aggregate fair market value as reasonably determined by the Borrowers in excess of $100,000), or the appointment of a receiver and manager, receiver, interim receiver or similar official or the making of a bankruptcy order against any of the Borrowers or the Collateral;

(b)     The issuance of an order granting a lien of equal or superior status to that of the DIP Charge, other than as provided in Section 12 of this DIP Agreement;

(c)     The issuance of any Court Order: (i) staying, reversing, vacating or otherwise modifying the DIP Charge; or (ii) that adversely impacts or could reasonably be expected

to adversely impact the rights and interests of the DIP Lender in connection with the Collateral or under this DIP Agreement or any Court Order, as determined by the DIP Lender in its sole discretion, acting reasonably; provided; however, that any such order that provides for payment in full forthwith of all of the DIP Obligations shall not constitute an Event of Default;

(d)   Failure of the Borrowers to pay any principal, interest, fees or any other amounts, in each case when due and owing hereunder (subject to a three (3) business day cure period in the case of interest, fees and any other amounts (other than principal amounts) due hereunder);

(e)   Any update to the DIP Agreement Cash Flow Projection required to be made in accordance with Section 6 of this DIP Agreement indicating that the Borrowers would require additional funding above the Maximum Amount to meet their obligations at any time during the period of the DIP Agreement Cash Flow Projection;

(f)   Any representation or warranty by any of the Borrowers herein or in any certificate delivered by any of the Borrowers to the DIP Lender shall be incorrect or misleading in any material respect as of the date made or deemed made;

(g)   A Court Order is made, a liability arises or an event occurs, including any change in the business, assets, or conditions, financial or otherwise, of the Borrowers, that has or will have a Material Adverse Effect; provided that the forgoing shall exclude changes to the Borrowers' business or its performance solely as a result of (i) the commencement, announcement or continuance of the Insolvency Proceedings or (ii) conducting the SISP;

(h)   Any breach of any Court Order upon receipt by the Borrowers of notice from the DIP Lender of such breach by the Borrowers;

(i)   Failure of the Borrowers to perform or comply with any other term or covenant under this DIP Agreement and such Default shall continue unremedied for a period of three (3) business days after the earlier of (i) delivery of notice given by the DIP Lender to the Borrowers,

with a copy to the Monitor or (ii) the Borrowers'
Knowledge of such failure to perform or comply;

(j)    The commencement by any Borrower of an action or
any other proceeding against the DIP Lender;

(k)    The expiry without further extension of the stay of
proceedings provided for in the Initial Order or the
ARIO, as applicable;

(l)    Any change of control of the Borrowers; or

(m)    The seeking or support by the Borrowers, or the
issuance, of any court order (in the Insolvency
Proceedings or otherwise) that is materially
inconsistent with the terms of this DIP Agreement.

**19.   CHIEF
RESTRUCTURING
OFFICER**

At any time during the Insolvency Proceedings, at the request
of the DIP Lender and with the consent of the Monitor, the
Borrowers will immediately seek the appointment of a Chief
Restructuring Officer acceptable to the DIP Lender (the
"**CRO**"). The terms of engagement of the CRO, including the
remuneration payable to the CRO, must be acceptable to the
DIP Lender.

**20.   REMEDIES:**

Upon the occurrence and during the continuance of an Event
of Default, whether or not there is availability under the DIP
Facility: (a) without any notice to the Borrowers, the
Borrowers shall have no right to receive any additional DIP
Advances or other accommodation of credit from the DIP
Lender except in the sole discretion of the DIP Lender; and (b)
the DIP Lender may immediately terminate the DIP Facility
and demand immediate payment of all of the DIP Obligations
by providing such a notice and demand to the Borrowers, with
a copy to the Monitor.  With the leave of the Canadian Court
sought on not less than three (3) business days' notice to the
Borrowers and the Monitor after the occurrence and during the
continuance of an Event of Default, the DIP Lender shall have
the right to: (a) enforce the DIP Charge and to exercise all other
rights and remedies in respect of the DIP Obligations and the
DIP Charge, including the right to realize on all Collateral and
to apply to the Canadian Court for the appointment of a court-
appointed receiver (and seek recognition of such appointment
from the US Court), subject to the application of proceeds of
realization to the Admin Charge and KERP Charge, if
applicable; (b) exercise the rights of a secured party under the
*Personal Property Security Act* (British Columbia), the

*Personal Property Security Act* (Ontario) or any other applicable law relating to the enforcement of liens by secured parties against any type of property, including the Collateral; (c) apply to the Canadian Court for an order on terms satisfactory to the Monitor and the DIP Lender, providing the Monitor with the power, in the name of and on behalf of the Borrowers, to take all necessary steps in the CCAA Proceedings; and (d) exercise all such other rights and remedies under the Court Orders and applicable law. No failure or delay by the DIP Lender in exercising any of its rights hereunder or at law shall be deemed a waiver of any kind, and the DIP Lender shall be entitled to exercise such rights in accordance with this DIP Agreement at any time. The rights and remedies of the DIP Lender under this DIP Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, including under the CCAA.

**21.    COMMITMENT FEE:**

The Borrowers shall pay to the DIP Lender a commitment fee (the **"Commitment Fee"**), as compensation for making the DIP Facility available, in an amount equal to 2% of the Maximum Amount (being $124,000.00). The Commitment Fee shall be earned and payable upon execution and delivery of this DIP Agreement to the DIP Lender and approval of this DIP Agreement, the ARIO and the Additional Provisional Relief Order. The Commitment Fee, once earned and payable, shall be non-refundable under all circumstances and shall be paid by adding the amount of such fee to the principal amount of the DIP Obligations on the Maturity Date. Amounts representing the Commitment Fee that are added to the principal amount of the DIP Obligations shall thereafter constitute principal and bear interest in accordance with Section 11 of this DIP Agreement.

**22.    LEGAL FEES:**

The Borrowers shall pay by wire transfer, within seven (7) days of receipt of a summary invoice, all reasonable and documented out-of-pocket expenses, including all reasonable legal expenses on a solicitor-client basis, incurred by the DIP Lender in connection with the Insolvency Proceedings, this DIP Agreement and the DIP Facility, including those with respect to any enforcement of the terms hereof or of the DIP Charge or otherwise incurred in connection with the DIP Facility (the **"Expenses"**).  Subject to Court approval of this DIP Agreement, all Expenses shall be non-refundable under all circumstances.

Notwithstanding the preceding paragraph, at the sole discretion of the DIP Lender, expenses may be paid by adding the amount of the Expenses to the principal amount of the DIP Obligations on the Maturity Date. Amounts representing the Expenses that are added to the principal amount of the DIP Obligations shall thereafter constitute principal and bear interest in accordance with Section 11 of this DIP Agreement.

**23. DIP LENDER APPROVALS:**

Any consent, approval, instruction or other expression of the DIP Lender to be delivered in writing may be delivered by any written instrument, including by way of email, by the DIP Lender pursuant to the terms hereof.

**24. EVIDENCE OF INDEBTEDNESS**

The DIP Lender's accounts and records constitute, in the absence of manifest error, conclusive evidence of the indebtedness of the Borrowers to the DIP Lender under the DIP Facility.

**25. TAXES:**

All payments by the Borrowers under this DIP Agreement to the DIP Lender, including any payments required to be made from and after the exercise of any remedies available to the DIP Lender upon an Event of Default, shall be made free and clear of, and without reduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings of any kind or nature whatsoever or any interest or penalties payable with respect thereto now or in the future imposed, levied, collected, withheld or assessed by any country or any political subdivision of any country (collectively, "**Taxes**").

**26. FURTHER ASSURANCES:**

The Borrowers shall, at their expense, from time to time do, execute and deliver, or will cause to be done, executed and delivered, all such further acts, documents and things as the DIP Lender may reasonably request for the purpose of giving effect to this DIP Agreement. Without limiting the foregoing, the Borrowers agree that if so requested by the DIP Lender, acting reasonably, they shall promptly execute and deliver to the DIP Lender any general security agreement or other security documents securing their obligations to the DIP Lender hereunder in forms reasonable and customary for debtor in possession financings, provided however that the execution of any such security document shall not be a condition precedent to funding the Maximum Amount or DIP Advances hereunder.

- 32 -

**27.  ENTIRE AGREEMENT;**

This DIP Agreement, including the schedules hereto constitutes the entire agreement between the parties relating to the subject matter hereof.

**28.  AMENDMENTS, WAIVERS, ETC.:**

No waiver or delay on the part of the DIP Lender in exercising any right or privilege hereunder will operate as a waiver hereof or thereof unless made in writing and delivered in accordance with the terms of this DIP Agreement. Any amendment to the terms of this DIP Agreement shall be made in writing and signed by the parties hereto.

**29.  ASSIGNMENT:**

After the occurrence and during the continuance of an Event of Default, the DIP Lender may assign this DIP Agreement and its rights and obligations hereunder, in whole or in part, to any party acceptable to the DIP Lender in its sole and absolute discretion, provided that the Monitor shall have provided its prior written consent based solely on the Monitor being satisfied that the proposed assignee has the financial capacity to act as DIP Lender.

Prior to the occurrence and continuance of an Event of Default, the DIP Lender shall not be permitted to assign its rights and obligations hereunder, in whole or in part, without the prior written consent of: (i) the Borrowers, such consent not to be unreasonably withheld; and (ii) the Monitor, including that the Monitor is satisfied that the proposed assignee has the financial capacity to act as DIP Lender.

Neither this DIP Agreement nor any right and obligation hereunder may be assigned by the Borrowers.

**30.  SEVERABILITY:**

Any provision in this DIP Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**31.  COUNTERPARTS AND SIGNATURES:**

This DIP Agreement may be executed in any number of counterparts and by electronic transmission, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument. Any party may execute this DIP Agreement by signing any counterpart of it.

**32.  DISCLOSURE**

Except as required by applicable laws (including any Court Orders), the Borrowers shall not issue any press release or

make any public announcement concerning this DIP Agreement, the Insolvency Proceedings or the operations of their business (the "**Communications**"), without the prior written consent of the DIP Lender, which is not to be unreasonably withheld. The Borrowers shall provide the DIP Lender with a reasonable opportunity to review and comment on all Communications in respect of this DIP Agreement, the Insolvency Proceedings or the operations of their business to their employees, contractors, business partners and contractual counter-parties or to the public prior to such Communications being issued or published.

**33. NOTICES:**         Any notice, request or other communication hereunder to any of the parties shall be in writing and be well and sufficiently given if delivered personally or sent by electronic mail to the attention of the person as set forth below:

**(a) In the case of the Borrowers:**

BRON Studios
5548 Short Street
Burnaby BC V5J 1L9

Attention: Aaron Gilbert
Email: agilbert@bronstudios.com

With a copy to:

Miller Thomson LLP
40 King Street West, Suite 5800
Toronto, ON M5H 3S1

Attention: Asim Iqbal
Email: aiqbal@millerthomson.com

And to US counsel:

Jones Walden LLC
699 Piedmont Ave NE
Atlanta, GA 30308, USA

Attention: Cameron McCord
Email: cmccord@joneswalden.com

And with a copy to the Monitor:

Grant Thornton Limited
Suite 1600 - 333 Seymour Street

Vancouver, BC V6B 0A4

Attention:           Mark Wentzell
Email:               Mark.Wentzell@ca.gt.com

And with a copy to the Monitor's Counsel:

Cassels Brock & Blackwell LLP
Suite 3200, Bay Adelaide Centre – North Tower
40 Temperance Street
Toronto, ON M5H 0B4

Attention:     John Birch
Email:         jbirch@cassels.com

**(b) In the case of the DIP Lender:**

Creative Wealth Media Lending LP 2016

c/o Creative Wealth Media GenPar Ltd.
151 Bloor Street West, Suite 700
Toronto, ON M5S 1S4

Attention:     Richard McConnell
Email:         richard.mcconnell@cwmoviefund.ca

With a copy to:

Bennett Jones LLP
3400 One First Canadian Place
P.O. Box 130
Toronto, ON M5X 1A4

Attention: Peter Dunne, Mike Shakra and Joshua Foster
Email: Dunnep@bennettjones.com                          /
shakram@bennettjones.com / fosterj@bennettjones.com

And with a copy to:

Parker, Hudson, Rainer & Dobbs LLP
303 Peachtree Street NE, Suite 3600
Atlanta, GA 30308, USA

Attention: Bryan Bates
Email: bbates@phrd.com

Any such notice shall be deemed to be given and received,
when received, unless received after 5:00 PT or on a day other

than a business day, in which case the notice shall be deemed to be received the next business day.

**34.  GOVERNING LAW AND JURISDICTION:**

This DIP Agreement shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**35.  CURRENCY AND JUDGMENT CURRENCY:**

Unless otherwise specified herein, all dollar amounts are in the lawful currency of the United States of America. The Borrowers shall pay to the DIP Lender all payments on account of principal and interest hereunder in lawful money of the United States of America.

If in the recovery by the DIP Lender of any amount owing by the Borrowers hereunder in any currency, judgment can only be obtained in another currency and because of changes in the exchange rate of such currencies between the date of judgment and payment in full of the amount of such judgment, the amount received by the DIP Lender is less than the recovery provided for under the judgment, the Borrowers shall immediately pay any such shortfall to the DIP Lender and such shortfall can be claimed by the DIP Lender against the Borrowers as an alternative or additional cause of action.

*[- Signature pages follow -]*

DocuSign Envelope ID: B28BA7EA-18F8-4A74-88B2-B4DABB6D1248

**IN WITNESS HEREOF**, the parties hereby execute this DIP Agreement as at the date first above mentioned.

**CREATIVE WEALTH MEDIA LENDING LP 2016,** by its general partner, **CREATIVE WEALTH MEDIA GENPAR LTD**

Per: _____

Name:  Richard McConnell

Title:  President

*Signature Page – DIP Agreement*

**BRON ANIMATION INC.**

Per: _Aaron Gilbert_

DocuSigned by:
Aaron Gilbert
5E05B98C84DA4EB...

Name: Aaron Gilbert

Title:　Chief Executive Officer

I/We have the authority to bind the corporation

**BRON CREATIVE CORP.**

Per: _Aaron Gilbert_

DocuSigned by:
Aaron Gilbert
5E05B98C84DA4EB...

Name: Aaron Gilbert

Title:　Chief Executive Officer

I/We have the authority to bind the corporation

**BRON DEVELOPMENTS INC.**

Per: _Aaron Gilbert_

DocuSigned by:
Aaron Gilbert
5E05B98C84DA4EB...

Name: Aaron Gilbert

Title:　Chief Executive Officer

I/We have the authority to bind the corporation

**BRON MEDIA CORP**.

Per: _Aaron Gilbert_

DocuSigned by:
Aaron Gilbert
5E05B98C84DA4EB...

Name: Aaron Gilbert

Title:　Chief Executive Officer

I/We have the authority to bind the corporation

**BRON MEDIA HOLDINGS INTL. CORP.**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**BRON MEDIA HOLDINGS USA INC.**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**BRON RELEASING INC.**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**BRON STUDIOS INC.**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

DocuSign Envelope ID: E7E08C58-CAE8-4E0C-B9BD-162BD5E6961F

**BRON VENTURES 1 (CANADA) CORP**

Per: _____

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


**BRON EVEREST PRODUCTIONS INC.**

Per: _____

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


**FABLES PRODUCTIONS BC INC.**

Per: _____

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


**GOSSAMER PRODUCTIONS BC INC.**

Per: _____

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


*Signature Page – DIP Agreement*

DocuSign Envelope ID: E7E08C58-CAE8-4E0C-B9BD-162BD5E6961E

**HENCH 2 BC PRODUCTIONS INC.**

Per: _Aaron Gilbert_

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**HENCHMEN PRODUCTIONS INC.**

Per: _Aaron Gilbert_

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**ROBIN HOOD DIGITAL PC BC  INC.**

Per: _Aaron Gilbert_

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**WINDOR PRODUCTIONS BC INC.**

Per: _Aaron Gilbert_

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

*Signature Page – DIP Agreement*

**BRON CREATIVE USA, CORP.**

Per: _Aaron Gilbert_
<span>5E05B98C84DA4EB...</span>

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


**BRON DIGITAL USA, LLC**

Per: _Aaron Gilbert_
<span>5E05B98C84DA4EB...</span>

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


**BRON LIFE USA INC.  (BRON LEGACY USA INC.)**

Per: _Aaron Gilbert_
<span>5E05B98C84DA4EB...</span>

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation


**BRON MEDIA HOLDINGS USA CORP.**

Per: _Aaron Gilbert_
<span>5E05B98C84DA4EB...</span>

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

*Signature Page – DIP Agreement*

DocuSign Envelope ID: E7E09C58-CAE8-4E0C-B9BD-162BD5E6961E

**BRON RELEASING USA INC.**

Per:

Name: Aaron Gilbert

Title:  Chief Executive Officer

I/We have the authority to bind the
corporation

**BRON STUDIOS USA INC.**

Per:

Name: Aaron Gilbert

Title:  Chief Executive Officer

I/We have the authority to bind the
corporation

**BRON VENTURES 1, LLC**

Per:

Name: Aaron Gilbert

Title:  Chief Executive Officer

I/We have the authority to bind the
corporation

**BRON STUDIOS USA
DEVELOPMENTS INC.**

Per:

Name: Aaron Gilbert

Title:  Chief Executive Officer

I/We have the authority to bind the
corporation

DocuSign Envelope ID: E7E08CE8-CAE8-4E0C-B9BD-162BD5E6961E

**BAKHORMA, LLC**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


**DRUNK PARENTS, LLC**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


**FABLES HOLDINGS USA, LLC**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


**FABLES PRODUCTIONS USA INC**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation

**GOSSAMER HOLDINGS USA, LLC**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**GOSSAMER PRODUCTIONS USA INC.**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**HARRY HAFT PRODUCTIONS, INC.**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

**HEAVYWEIGHT HOLDINGS, LLC (PREVIOUSLY HARRY HAFT FILMS, LLC)**

Per:

Name: Aaron Gilbert

Title:   Chief Executive Officer

I/We have the authority to bind the corporation

*Signature Page – DIP Agreement*

**I AM PINK PRODUCTIONS, LLC**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation

**NATIONAL ANTHEM HOLDINGS, LLC**
**(F. K. A. BCDC HOLDINGS, LLC)**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation

**NATIONAL ANTHEM PRODCO INC.**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation

**OAKLAND PICTURES HOLDINGS, LLC**

Per:

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation

*Signature Page – DIP Agreement*

**PATHWAY PRODUCTIONS, LLC**

Per: _____

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


**ROBIN HOOD DIGITAL PC USA INC.**

Per: _____

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


**ROBIN HOOD DIGITAL USA, LLC**

Per: _____

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


**SOLITARY HOLDINGS USA, LLC**

Per: _____

Name: Aaron Gilbert

Title: Chief Executive Officer

I/We have the authority to bind the corporation


*Signature Page – DIP Agreement*

DocuSign Envelope ID: E7E08C58-CAE8-4E0C-B9BD-162BD5E9961E

**SURROUNDED HOLDINGS USA LLC**

Per: _____

              Name:  Aaron Gilbert

              Title:   Chief Executive Officer

              I/We have the authority to bind the corporation

**WELCOME TO ME, LLC**

Per: _____

              Name:  Aaron Gilbert

              Title:   Chief Executive Officer

              I/We have the authority to bind the corporation

**LUCITE DESK, LLC**

Per: _____

              Name:  Aaron Gilbert

              Title:   Chief Executive Officer

              I/We have the authority to bind the corporation

## SCHEDULE "A"

## BORROWERS

|  | Borrower | Jurisdiction |
|---|---|---|
| **1.** | BRON Animation Inc. | British Columbia |
| **2.** | BRON Creative Corp. | Ontario |
| **3.** | BRON Developments Inc. | British Columbia |
| **4.** | BRON Media Corp. | British Columbia |
| **5.** | BRON Media Holdings Intl. Corp. | British Columbia |
| **6.** | BRON Media Holdings USA Inc. | British Columbia |
| **7.** | BRON Releasing Inc. | British Columbia |
| **8.** | BRON Studios Inc. | British Columbia |
| **9.** | BRON Ventures 1 (Canada) Corp | British Columbia |
| **10.** | BRON Everest Productions Inc. | Ontario |
| **11.** | Fables Productions BC Inc. | British Columbia |
| **12.** | Gossamer Productions BC Inc. | British Columbia |
| **13.** | Hench 2 BC Productions Inc. | British Columbia |
| **14.** | Henchmen Productions Inc. | British Columbia |
| **15.** | Robin Hood Digital PC BC  Inc. | British Columbia |
| **16.** | Windor Productions BC Inc. | British Columbia |
| **17.** | BRON Creative USA, Corp. | Nevada |
| **18.** | BRON Digital USA, LLC | Delaware |
| **19.** | BRON Life USA Inc.  (BRON Legacy USA Inc.) | Delaware |
| **20.** | BRON Media Holdings USA Corp. | Delaware |

|  | **Borrower** | **Jurisdiction** |
|---|---|---|
| **21.** | BRON Releasing USA Inc. | Delaware |
| **22.** | BRON Studios USA Inc. | Nevada |
| **23.** | BRON Ventures 1, LLC | Delaware |
| **24.** | BRON Studios USA Developments Inc. | Nevada |
| **25.** | Bakhorma, LLC | Washington |
| **26.** | Drunk Parents, LLC | New York |
| **27.** | Fables Holdings USA, LLC | Delaware |
| **28.** | Fables Productions USA Inc | Delaware |
| **29.** | Gossamer Holdings USA, LLC | Delaware |
| **30.** | Gossamer Productions USA Inc. | Delaware |
| **31.** | Harry Haft Productions, Inc. | New York |
| **32.** | Heavyweight Holdings, LLC (previously Harry Haft Films, LLC) | Delaware |
| **33.** | I Am Pink Productions, LLC | Delaware |
| **34.** | Lucite Desk, LLC | Delaware |
| **35.** | National Anthem Holdings, LLC (f. k. a. BCDC Holdings, LLC) | Delaware |
| **36.** | National Anthem ProdCo Inc. | New Mexico |
| **37.** | Oakland Pictures Holdings, LLC | Delaware |
| **38.** | Pathway Productions, LLC | Delaware |
| **39.** | Robin Hood Digital PC USA Inc. | Delaware |
| **40.** | Robin Hood Digital USA, LLC | Delaware |
| **41.** | Solitary Holdings USA, LLC | Delaware |

|     | **Borrower**                    | **Jurisdiction** |
| --- | ------------------------------- | ---------------- |
| **42.** | Surrounded Holdings USA LLC | Delaware         |
| **43.** | Welcome to Me, LLC          | California        |

## SCHEDULE "B"

## CASH FLOW PROJECTION

See attached.

**BRON MEDIA GROUP ("Bron")**
**Consolidated Cash Flow Forecast**
**July 19, 2023 to October 18, 2023 (the "Cash Flow Period")**

| For the week ending, In USD | Notes | Forecast Week 1 26-Jul-23 | Forecast Week 2 02-Aug-23 | Forecast Week 3 09-Aug-23 | Forecast Week 4 16-Aug-23 | Forecast Week 5 23-Aug-23 | Forecast Week 6 30-Aug-23 | Forecast Week 7 06-Sep-23 | Forecast Week 8 13-Sep-23 | Forecast Week 9 20-Sep-23 | Forecast Week 10 27-Sep-23 | Forecast Week 11 04-Oct-23 | Forecast Week 12 11-Oct-23 | Forecast Week 13 18-Oct-23 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash Balance** | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Receipts** | 2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll Expense | 3 | | | | | | | | | | | | | | |
| BRON Media | | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | - | 59,322 | 415,253 |
| BRON Animation | | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | - | 51,778 | 362,445 |
| BRON Studios | | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | - | 34,019 | 238,133 |
| BRON Studios USA | | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | - | 60,865 | 426,058 |
| BRON Digital USA | | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | - | 37,558 | 262,907 |
| BRON Digital USA (Interactive Group) | | 38,282 | - | 38,282 | - | 38,282 | - | 38,282 | - | 38,282 | - | 38,282 | - | - | 267,974 |
| KERP | 4 | - | - | - | - | - | - | - | - | - | - | - | - | 234,425 | 234,425 |
| Source Deductions | 5 | 665,851 | - | - | - | - | - | - | - | - | - | - | - | - | 665,851 |
| Notice Period Employees | 6 | - | - | 158,341 | - | - | - | - | - | - | - | - | - | - | 158,341 |
| Total Payroll Expense | | 947,675 | - | 440,165 | - | 281,824 | - | 281,824 | - | 281,824 | - | 281,824 | - | 516,249 | 3,031,385 |
| Other Operating Expenses | 7 | | | | | | | | | | | | | | |
| Rent | 8 | 116,653 | - | - | - | 36,041 | - | - | - | - | - | 36,041 | - | - | 188,735 |
| Software | 9 | 58,246 | - | - | - | 33,046 | - | 11,547 | 3,877 | - | - | 33,046 | - | 21,391 | 161,154 |
| Interest | 10 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Selling, General & Administration | 11 | 6,820 | 9,579 | 6,199 | 49,095 | 6,820 | 9,579 | 49,095 | 6,199 | 58,674 | 6,820 | 9,579 | 6,199 | 49,095 | 273,754 |
| Other Operating Expenses | | 181,719 | 9,579 | 6,199 | 49,095 | 75,907 | 9,579 | 60,642 | 10,076 | 58,674 | 75,907 | 78,666 | 6,199 | 70,486 | 623,643 |
| **Total Operating Disbursements** | | **1,129,395** | **9,579** | **446,364** | **49,095** | **357,732** | **9,579** | **342,466** | **10,076** | **340,498** | **75,907** | **291,403** | **6,199** | **586,735** | **3,655,029** |
| Net Cashflow From Operations | | (1,129,395) | (9,579) | (446,364) | (49,095) | (357,732) | (9,579) | (342,466) | (10,076) | (340,498) | (75,907) | (291,403) | (6,199) | (586,735) | (3,655,029) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | |
| Bron Legal Counsel Fees | 12 | 113,688 | 75,792 | 75,792 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 56,844 | 833,712 |
| Proposed Monitor Fees | | 75,792 | 75,792 | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | 606,336 |
| Monitor Catch up Fees | | 121,267 | - | - | - | - | - | - | - | - | - | - | - | - | 121,267 |
| Proposed Monitor's Legal Counsel Fees | | - | 75,792 | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | - | 75,792 | 530,544 |
| Proposed Monitor's Legal Counsel Catch up Fees | | 26,527 | - | - | - | - | - | - | - | - | - | - | - | - | 26,527 |
| US Legal Fees and US Filing Fees | 13 | 190,000 | - | - | - | - | - | - | - | - | - | 85,000 | - | - | 275,000 |
| UK Legal Fees | 14 | 75,792 | - | - | - | - | - | - | - | - | - | - | - | - | 75,792 |
| DIP Financing Fees | | 18,948 | - | - | - | 18,948 | - | - | - | 18,948 | - | - | - | 18,948 | 75,792 |
| CCAA Professional Fees | | 622,015 | 227,376 | 227,376 | 56,844 | 227,376 | 56,844 | 208,428 | 56,844 | 227,376 | 56,844 | 293,428 | 56,844 | 227,376 | 2,544,971 |
| **Total Disbursements** | | **1,751,409** | **236,955** | **673,740** | **105,939** | **585,108** | **66,423** | **550,894** | **66,920** | **567,874** | **132,751** | **584,831** | **63,043** | **814,111** | **6,200,000** |
| Net Cashflow | | (1,751,409) | (236,955) | (673,740) | (105,939) | (585,108) | (66,423) | (550,894) | (66,920) | (567,874) | (132,751) | (584,831) | (63,043) | (814,111) | (6,200,000) |
| **DIP Financing** | | | | | | | | | | | | | | | |
| DIP Financing Advances | | 1,751,409 | 236,955 | 673,740 | 105,939 | 585,108 | 66,423 | 550,894 | 66,920 | 567,874 | 132,751 | 584,831 | 63,043 | 814,111 | 6,200,000 |
| **Ending Cash Balance** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cumulative DIP Financing | | 1,751,409 | 1,988,364 | 2,662,105 | 2,768,044 | 3,353,151 | 3,419,575 | 3,970,469 | 4,037,389 | 4,605,263 | 4,738,015 | 5,322,846 | 5,385,889 | 6,200,000 | 6,200,000 |

**BRON MEDIA GROUP ("Bron")**
**Notes to the Cash Flow Forecast**
**July 19, 2023 to October 18, 2023 (the "Cash Flow Period")**

**Disclaimer**
1. This Cash Flow Forecast is prepared by Bron in accordance with s. 23(1)(b) of the Companies Creditors' Arrangement Act ("CCAA").
2. Bron has prepared this Forecast on probable and hypothetical assumptions that reflect the Bron's planned course of action for the period of 13 weeks. Management is of the opinion that, as at the date of filing the Cash Flow Forecast, the assumptions used to develop the projection represent the most probable set of economic conditions facing Bron and that the assumptions used proved a reasonable basis for and are consistent with the purpose of this Cash Flow Forecast.
3. The Cash Flow Forecast has been prepared by Bron and has been reviewed by the Proposed Monitor. The Proposed Monitor has not verified or confirmed certain expenses incurred by Bron which are reflected in this Cash Flow Forecast.
4. The information contained in this Cash Flow Forecast is subject to changing assumptions and/or with the receipt of new or additional information this actual results may vary. This Cash Flow Forecast should not be used for any other purpose than its stated purpose, and creditors are cautioned that the information provided in this Cash Flow Forecast could vary based on changing future circumstances.

**Note 1**
The Cash Flow Forecast assumes there will be no material opening cash balance.

**Note 2**
Bron advises that there will be no corporate receipts during the Cash Flow Period.

**Note 3**
Payroll expense assumes Bron reduces headcount and production of the Digital Projects is placed on hold. Work will continue on Bron's Fortnite rollout under the Interactive Group.

**Note 4**
Bron advises that it intends to seek a Key Employee Retention Plan ("KERP") in the CCAA proceedings.

**Note 5**
Pursuant to an agreement between the Companies and CWM, amounts relate to outstanding source deductions in respect of payroll, withholding taxes and dues for government programs, but does not include amounts relating to source deductions for the last pay period.

**Note 6**
Bron advises that it terminated a number of employees in June 2023. The Cash Flow Forecast includes amounts to be paid to these employees as they work their respective notice periods. Bron has not provided a breakdown of these amounts by employee to date.

**Note 7**
Operating expenses assume a CCAA filing with pre-filing amounts stayed, other than as disclosed in Note 11.  Critical supplier payments are included, but are not material.

**Note 8**
Rent is for studios in Los Angeles and Burnaby. Bron advises that it intends to disclaim its Los Angeles lease and move to a smaller facility in Los Angeles as part of its restructuring. The Los Angeles lease is CAD $111,564 monthly so rent expense may decrease during the Cash Flow Period. Bron has yet to provide a projected cost for the replacement Los Angeles studio.

**Note 9**
Software is Zoom, Microsoft, Vision 33 (accounting), Bamboo (HR) and others necessary for Bron's operations during the Cash Flow Period. The amounts also include licence renewal fees.

**Note 10**
The Cash Flow Forecast assumes that interest on existing loans will be accrued during the Cash Flow Period.

**Note 11**
SG&A includes employee benefits payments. The Cash Flow Forecast assumes that pre-filing employee benefits will be paid.

**Note 12**
Bron Legal Counsel Fees assumes no material costs in regard to litigation in connection with the orders sought in Canada during the CCAA proceeding, however does assume fees in recognition of litigation in the US.

**Note 13**
The Cash Flow Forecast assumes that there will be Chapter 15 bankruptcy proceedings in the US in conjunction with the CCAA proceedings.The $190,000 reflected in week one is required by legal counsel upon approval of the initial CCAA Order.

**Note 14**
The Cash Flow Forecast assumes that there will be UK recognition orders.

**Tuesday, July, 18, 2023**

**Bron Media Group**

Per: _____
**Dave Whitney, Chief Financial Officer**

**Grant Thornton Limited, as Proposed Monitor**

Per: _____
**Mark Wentzell, CPA, CA, CIRP, LIT, Senior Vice President**

**SCHEDULE "C"**

**FORM OF DRAWDOWN CERTIFICATE**

TO:         Creative Wealth Media Lending LP 2016 (the "**DIP Lender**") and Grant
            Thornton Limited (the "**Monitor**")

FROM:       The parties identified in Appendix "A" hereto (collectively. the "**Borrowers**")

DATE:       [●]

1.    This certificate is delivered to you in connection with a request for a Subsequent DIP Draw
      pursuant to the DIP Agreement made as of July 18, 2023, between the Borrowers and the
      DIP Lender, as amended, supplemented, restated or replaced from time to time (the "**DIP
      Agreement**"). All capitalized terms used, but not otherwise defined, in this certificate shall
      have the respective meanings set forth in the DIP Agreement, unless the context requires
      otherwise.

2.    The Borrowers hereby request a DIP Advance as follows:

      (a)    Date of DIP Advance:               _____

      (b)    Aggregate amount of requested DIP Advance:         $[●]

      to be transferred into the Borrowers' Account by the DIP Lender or the Monitor, as
      applicable, by direct deposit in accordance with the DIP Agreement.

3.    All of the representations and warranties of the Borrowers as set forth in the DIP Agreement
      are true and correct as at the date hereof, as though made on and as of the date hereof (except
      for any representations and warranties made as of a specific date, which shall be true and
      correct as of the specific date made).

4.    All of the covenants of the Borrowers contained in the DIP Agreement and all other terms
      and conditions contained in the DIP Agreement to be complied with by the Borrowers, and
      not waived in writing by or on behalf of the DIP Lender, have been complied with.

5.    The Borrowers are in compliance with all Court Orders.

6.    The proceeds of the DIP Advance hereby requested will be applied solely in accordance
      with the DIP Agreement Cash Flow Projection, or as has been otherwise agreed to by the
      DIP Lender in advance in writing, and shall be utilized exclusively to fund the expense
      items listed on Appendix "B" hereto.

7.    No Default or Event of Default has occurred and is continuing nor will any such event
      occur as a result of the DIP Advance hereby requested.

**[Borrowers]**

By: _____

        Name:

        Title:

cc:     [●]

**Appendix "A"**
**Borrowers**

**Appendix "B"**
**Approved Expense Items**

| Expense Item | Amount |
|---|---|
| ● | $● |
| **TOTAL:** | $● |

## SCHEDULE "D"

## INITIAL ORDER

See attached.

No. _____
**Vancouver Registry**

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED
AND
IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*,
S.B.C. 2002, c. 57, AS AMENDED AND THE BUSINESS CORPORATIONS ACT, R.S.O.
1990, C. B.16, AS AMENDED
AND
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
BRON MEDIA CORP. AND THE ENTITIES LISTED AT SCHEDULE "A"
PETITIONERS

**PETITIONERS**

**O R D E R MADE AFTER APPLICATION**

BEFORE THE HONOURABLE          )
                              )          19/07/2023
JUSTICE GOMERY                )

THE APPLICATION of the Petitioners coming on for hearing at Vancouver, British Columbia, on the 19th day of July, 2023 (the "**Order Date**"); AND ON HEARING Asim Iqbal and Bryan Hicks, counsel for the Petitioners and those other counsel listed on Schedule "C" hereto; AND UPON READING the material filed, including the First Affidavit of Aaron Gilbert sworn July 18, 2023 (the "**Gilbert Affidavit**") and the consent of Grant Thornton Limited to act as Monitor (in such capacity, the "**Monitor**");

AND UPON BEING ADVISED that the secured creditors who are likely to be affected by the charges created herein were given notice; AND pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36 as amended (the "**CCAA**"), the British Columbia Supreme Court Civil Rules and the inherent jurisdiction of this Honourable Court;

**THIS COURT ORDERS AND DECLARES THAT:**

**JURISDICTION**

1.      The Petitioners are companies to which the CCAA applies.

**SUBSEQUENT HEARING DATE**

2.      The hearing of the Petitioners' application for an extension of the Stay Period (as defined in paragraph 15 of this Order) and for any ancillary relief shall be held at the Courthouse at 800 Smithe Street, Vancouver, British Columbia at 9:00 a.m. on Thursday, the 27th day of July, 2023 for one hour and continuing at 9:00 a.m. on Friday, the 28th day of July, 2023 for one hour, or such other date as this Court may order.

**PLAN OF ARRANGEMENT**

3.      The Petitioners shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "**Plan**").

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      Subject to this Order and any further Order of this Court, the Petitioners shall remain in possession and control of their current and future assets, licences, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"), and continue to carry on their business (the "**Business**") in the ordinary course and in a manner consistent with the preservation of the Business and the Property.  The Petitioners shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively, "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for carrying out the terms of this Order.

**CASH MANAGEMENT SYSTEM**

5.      The Petitioners shall be entitled to continue to utilize the central cash management system currently in place as described in the Gilbert Affidavit or, with the prior written consent of the Interim Lender (as hereinafter defined) and the Monitor, replace it with another substantially similar central cash management system (the "**Cash Management System**"), and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by any of the Petitioners of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Petitioners, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan (if any) with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      Subject to the terms of the DIP Term Sheet and Definitive Documents (each, as hereinafter defined), the Petitioners shall be entitled, but not required, to pay the following expenses which may have been incurred prior to the Order Date:

(a)     all outstanding wages, salaries, employee and pension benefits (including long and short term disability payments), vacation pay and expenses (but excluding severance pay) payable before or after the Order Date, in each case incurred in the ordinary course of business and consistent with the relevant compensation policies and arrangements existing at the time incurred (collectively "**Wages**");

(b)     the fees and disbursements of any Assistants retained or employed by any of the Petitioners which are related to the Restructuring (as hereinafter defined), at their standard rates and charges, including payment of the fees and disbursements of legal counsel retained by the Petitioners, whenever and wherever incurred, in respect of:

(i)    these proceedings or any other similar proceedings in other jurisdictions in which any of the Petitioners or any subsidiaries or affiliated companies of the Petitioners are domiciled;

(ii)    any litigation in which any of the Petitioners are named as a party or are otherwise involved, whether commenced before or after the Order Date; and

(iii)    any related corporate matters; and

(c)    with the prior written consent of the Monitor and the Interim Lender, amounts owing for goods and services actually supplied to the Petitioners in the ordinary course of business and consistent with existing policies and procedures (including, without limitation, outstanding source deductions owing to governmental authorities).

7.    Except as otherwise provided herein and subject to the terms of the DIP Term Sheet and Definitive Documents, the Petitioners shall be entitled to pay all expenses reasonably incurred by the Petitioners in carrying on the Business in the ordinary course following the Order Date, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably incurred and which are necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services;

(b)    all obligations incurred by the Petitioners after the Order Date, including without limitation, with respect to goods and services actually supplied to the Petitioners following the Order Date (including those under purchase orders outstanding at the Order Date but excluding any interest on the Petitioners' obligations incurred prior to the Order Date); and

(c)    fees and disbursements of the kind referred to in paragraph 6(b) which may be incurred after the Order Date.

8.      The Petitioners are authorized to remit, in accordance with legal requirements, or pay:

(a)      any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from Wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes or any such claims which are to be paid pursuant to Section 6(3) of the CCAA;

(b)      all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Petitioners in connection with the sale of goods and services by the Petitioners, but only where such Sales Taxes accrue or are collected after the Order Date, or where such Sales Taxes accrued or were collected prior to the Order Date but not required to be remitted until on or after the Order Date; and

(c)      any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal property taxes, municipal business taxes or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors.

9.      Until such time as a real property lease is disclaimed in accordance with the CCAA, the Petitioners shall pay, without duplication, all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable as rent to the landlord under the lease, but for greater certainty, excluding accelerated rent or penalties, fees or other charges arising as a result of the insolvency of the Petitioners or the making of this Order) based on the terms of existing lease arrangements or as otherwise may be negotiated between the Petitioners and the landlord from time to time ("**Rent**"), for the period commencing from and including the Order Date, twice-monthly in equal payments on the first and fifteenth day of the month in advance (but not in arrears).   On the date of the first of such payments, any Rent relating to the period commencing from and including Order Date shall also be paid.

10.     Except as specifically permitted herein and subject to the DIP Term Sheet and the Definitive Documents, the Petitioners are hereby directed, until further Order of this Court:

(a)     to make no payments of principal, interest thereon or otherwise on account of amounts owing by any of the Petitioners to any of their respective creditors as of the Order Date except as authorized by this Order;

(b)     to make no payments in respect of any financing leases which create security interests;

(c)     to grant no security interests, trust, mortgages, liens, charges or encumbrances upon or in respect of any of their Property, nor become a guarantor or surety (other than in the ordinary course of the Business and with the prior written consent of the Interim Lender, where a completion guarantee or other bond is required to be posted by one or more of the Petitioners in connection with the production of an animated or live-action film, series television or other production), nor otherwise become liable in any manner with respect to any other Person or entity except as authorized by this Order;

(d)     to not grant credit except in the ordinary course of the Business only to their customers for goods and services actually supplied to those customers, provided such customers agree that there is no right of set-off in respect of amounts owing for such goods and services against any debt owing by the Petitioners to such customers as of the Order Date; and

(e)     to not incur liabilities except in the ordinary course of Business.

**RESTRUCTURING**

11.     Subject to such requirements as are imposed by the CCAA and such covenants as may be contained in the DIP Term Sheet or Definitive Documents, the Petitioners shall have the right to:

(a)     permanently or temporarily cease, downsize or shut down all or any part of their Business or operations and commence marketing efforts in respect of any of their

redundant or non-material assets and to dispose of redundant or non-material assets not exceeding $_____500,000_____ in any one transaction or $_____1,000,000_____ in the aggregate;

(b) terminate the employment of such of their employees or temporarily lay off such of their employees as they deem appropriate; and

(c) pursue all avenues of refinancing for their Business or Property, in whole or part;

all of the foregoing to permit the Petitioners to proceed with an orderly restructuring of the Business (the "**Restructuring**").

12. The Petitioners shall provide each of the relevant landlords with notice of the Petitioners' intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Petitioners' entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors who claim a security interest in the fixtures, such landlord and the Petitioners, or by further Order of this Court upon application by the Petitioners, the landlord or the applicable secured creditors on at least two (2) clear days' notice to the other parties. If the Petitioners disclaims the lease governing such leased premises in accordance with Section 32 of the CCAA, they shall not be required to pay Rent under such lease pending resolution of any dispute concerning such fixtures (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Petitioners' claim to the fixtures in dispute.

13. If a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then: (a) during the period prior to the effective time of the disclaimer, the landlord may show the affected leased premises to prospective tenants during normal business hours on giving the Petitioners and the Monitor 24 hours' prior written notice; and (b) at the effective time of the disclaimer, the landlord shall be entitled to take possession of any such leased premises without

waiver of or prejudice to any claims the landlord may have against the Petitioners, or any other rights the landlord might have, in respect of such lease or leased premises and the landlord shall be entitled to notify the Petitioners of the basis on which it is taking possession and gain possession of and re-lease such leased premises to any third party or parties on such terms as the landlord considers advisable, provided that nothing herein shall relieve the landlord of its obligation to mitigate any damages claimed in connection therewith.

14.    Pursuant to Section 7(3)(c) of the *Personal Information Protection and Electronics Documents Act*, S.C. 2000, c. 5 and Section 18(1)(o) of the *Personal Information Protection Act*, S.B.C. 2003, c. 63, and any regulations promulgated under authority of either Act, as applicable (the "**Relevant Enactment**"), the Petitioners, in the course of these proceedings, are permitted to, and hereby shall, disclose personal information of identifiable individuals in their possession or control to stakeholders, their advisors, prospective investors, financiers, buyers or strategic partners (collectively, "**Third Parties**"), but only to the extent desirable or required to negotiate and complete the Restructuring or to prepare and implement the Plan or transactions for that purpose; provided that the Third Parties to whom such personal information is disclosed enter into confidentiality agreements with the Petitioners binding them in the same manner and to the same extent with respect to the collection, use and disclosure of that information as if they were an organization as defined under the Relevant Enactment, and limiting the use of such information to the extent desirable or required to negotiate or complete the Restructuring or to prepare and implement the Plan or transactions for that purpose, and attorning to the jurisdiction of this Court for the purposes of that agreement.  Upon the completion of the use of personal information for the limited purposes set out herein, the Third Parties shall return the personal information to the Petitioners or destroy it.  If the Third Parties acquire personal information as part of the Restructuring or the preparation and implementation of the Plan or transactions in furtherance thereof, such Third Parties may, subject to this paragraph and any Relevant Enactment, continue to use the personal information in a manner which is in all respects identical to the prior use thereof by the Petitioners.

**STAY OF PROCEEDINGS, RIGHTS AND REMEDIES**

15.     Until and including July 29, 2023, or such later date as this Court may order (the "**Stay Period**"), no action, suit or proceeding in any court or tribunal (each, a "**Proceeding**") against or in respect of the Petitioners or the Monitor, or affecting the Business or the Property, shall be commenced or continued except with the prior written consent of the Petitioners and the Monitor or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Petitioners or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

16.     During the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of any of the Petitioners or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the prior written consent of the Petitioners and the Monitor or leave of this Court.

17.      Nothing in this Order, including paragraphs 15 and 16, shall: (i) empower the Petitioners to carry on any business which the Petitioners are not lawfully entitled to carry on; (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA; (iii) prevent the filing of any registration to preserve or perfect a mortgage, charge or security interest (subject to the provisions of Section 39 of the CCAA relating to the priority of statutory Crown securities); or (iv) prevent the registration or filing of a lien or claim for lien or the commencement of a Proceeding to protect lien or other rights that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such lien, claim for lien or Proceeding except for service of the initiating documentation on the Petitioners.

**STAY IN RESPECT OF THE NON-PETITIONER ENTITIES**

18.     During the Stay Period, no Person shall (a) commence any Proceeding or enforcement process, (b) terminate, repudiate, make any demand, accelerate, alter, amend, declare in default,

exercise any options, rights or remedies, or (c) discontinue, fail to honour, alter, interfere with or cease to perform any obligation pursuant to or in respect of any agreement, lease, sublease license or permit with respect to which any of the Non-Petitioner Entities (as defined in the Gilbert Affidavit) listed at **Schedule "B"** hereto are a party, borrower, principal obligor or guarantor, by reason of:

(a)     any of the Petitioners being insolvent, having become subject to insolvency proceedings, or having made an petition to this Court under the CCAA or the granting of this Order;

(b)     any of the Petitioners being party to these proceedings or taking any steps related thereto;

(c)     the stay of proceedings granted pursuant to this paragraph 18;

(d)     any default or cross-default arising from the matters set out in the foregoing subparagraphs (a) to (c),

except with the prior written consent of the Petitioners and the Monitor, or with leave of this Court.

## NO INTERFERENCE WITH RIGHTS

19.     During the Stay Period, no Person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, rescind, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, licence, authorization or permit in favour of or held by any of the Petitioners, except with the prior written consent of the Petitioners and the Monitor or leave of this Court.

**CONTINUATION OF SERVICES**

20.     During the Stay Period, all Persons having oral or written agreements with any of the Petitioners or mandates under an enactment for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll and benefit services, accounting services, insurance, transportation, services, utility, or other services, to the Business or any of the Petitioners, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with, suspending or terminating the supply of such goods or services as may be required by any of the Petitioners, and that the Petitioners shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the Order Date are paid by the Petitioners in accordance with normal payment practices of the Petitioners or such other practices as may be agreed upon by the supplier or service provider and the applicable Petitioners and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

21.     Notwithstanding any provision in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the Order Date, nor shall any Person be under any obligation to advance or re-advance any monies or otherwise extend any credit to the Petitioners on or after the Order Date. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

22.     During the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against the directors or officers of any of the Petitioners with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of any of the Petitioners whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the

payment or performance of such obligations, until a compromise or arrangement in respect of the Petitioners, if one is filed, is sanctioned by this Court or is refused by the creditors of the Petitioners or this Court. Nothing in this Order, including in this paragraph, shall prevent the commencement of a Proceeding to preserve any claim against a director or officer of any of the Petitioners that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such Proceeding except for service of the initiating documentation on the applicable director or officer.

**DIRECTORS AND OFFICERS INDEMNIFICATION AND CHARGE**

23.    The Petitioners shall indemnify their directors and officers against obligations and liabilities that they may incur as directors or officers of the Petitioners after the commencement of the within proceedings, except to the extent that, with respect to any director or officer, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

24.    The directors and officers of the Petitioners shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of USD $250,000, as security for the indemnity provided in paragraph 22 of this Order.  The Directors' Charge shall have the priority set out in paragraphs 41 and 43 herein.

25.    Notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Petitioners' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23 of this Order.

**APPOINTMENT OF MONITOR**

26.      Grant Thornton Limited is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Petitioners with the powers and obligations set out in the CCAA or set forth herein, and that the Petitioners and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Petitioners pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

27.      The Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

      (a)      monitor the Petitioners' receipts and disbursements;

      (b)      report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, the DIP Term Sheet, the Definitive Documents and such other matters as may be relevant to the proceedings herein;

      (c)      assist the Petitioners, to the extent required by the Petitioners, in their dissemination, to the Interim Lender and its counsel, as and when required or permitted under the DIP Term Sheet or the Definitive Documents or as otherwise reasonably required by the Interim Lender, of financial and other information as agreed to between the Petitioners and the Interim Lender which may be used in these proceedings including reporting on a basis to be agreed with the Interim Lender;

      (d)      advise the Petitioners in their preparation of the Petitioners' cash flow statements and reporting required by the Interim Lender, which information shall be reviewed with the Monitor and delivered to the Interim Lender and its counsel as

and when required under the DIP Term Sheet and the Definitive Documents or as otherwise agreed to by the Interim Lender;

(e)    advise the Petitioners in their development of the Plan and any amendments to the Plan;

(f)    assist the Petitioners, to the extent required by the Petitioners, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;

(g)    monitor all payments, obligations and transfers as between any of the Petitioners;

(h)    have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Petitioners, to the extent that is necessary to adequately assess the Petitioners' business and financial affairs or to perform its duties arising under this Order;

(i)    be at liberty to engage independent legal counsel or such other Persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(j)    perform such other duties as are required by this Order or by this Court from time to time.

28.    The Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, or by inadvertence in relation to the due exercise of powers or performance of duties under this Order, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof, and nothing in this Order shall be construed as resulting in the Monitor being an employer or a successor employer, within the meaning of any statute, regulation or rule of law or equity, for any purpose whatsoever.

29.      Nothing herein contained shall require or allow the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, **"Possession"**) of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Fisheries Act*, the British Columbia *Environmental Management Act*, the British Columbia *Fish Protection Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation.   For greater certainty, the Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.      The Monitor shall provide any creditor of the Petitioners and the Interim Lender with information provided by the Petitioners in response to reasonable requests for information made in writing by such creditor addressed to the Monitor.   The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph.   In the case of information that the Monitor has been advised by the Petitioners is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Petitioners may agree.

31.      In addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part.   Nothing in this Order shall derogate from the rights and protections afforded the Monitor by the CCAA or any applicable legislation.

32.      The Monitor, counsel to the Monitor, if any, and counsel to the Petitioners shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the

Petitioners as part of the cost of these proceedings.  The Petitioners are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor and counsel to the Petitioners on a periodic basis and, in addition, the Petitioners are hereby authorized to pay to the Monitor, counsel to the Monitor, and counsel to the Petitioners, retainers in the amount[s] of $50,000, respectively, to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

33.    The Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the British Columbia Supreme Court who may determine the manner in which such accounts are to be passed, including by hearing the matter on a summary basis or referring the matter to a Registrar of this Court.

**ADMINISTRATION CHARGE**

34.    The Monitor, counsel to the Monitor, if any, and counsel to the Petitioners shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of USD $250,000, as security for their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order which are related to the Petitioners' restructuring.  The Administration Charge shall have the priority set out in paragraphs 41 and 43 hereof.

**INTERIM FINANCING**

35.    The Petitioners are hereby authorized and empowered to obtain and borrow under a credit facility (the "**DIP Facility**") from Creative Wealth Media Lending LP 2016 (the "**Interim Lender**") in order to finance the continuation of the Business and preservation of the Property, all in accordance with the DIP Term Sheet and the Definitive Documents, provided that borrowings under the DIP Facility shall not exceed the aggregate principal amount of USD $1,751,409.00  unless permitted by further Order of this Court.

36.     The DIP Facility shall be on the terms and subject to the conditions set forth in the DIP Term Sheet between the Petitioners and the Interim Lender dated as of July 18, 2023 (the "**DIP Term Sheet**"), filed.

37.     The Petitioners are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the Interim Lender pursuant to the terms thereof, and the Petitioners are hereby authorized and directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the Interim Lender under and pursuant to the DIP Term Sheet and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

38.     The Interim Lender shall be entitled to the benefit of and is hereby granted a charge (the "**Interim Lender's Charge**") on the Property up to the maximum amount of USD $1,751,409.00 (plus accrued and unpaid interest, fees and expenses) to secure amounts advanced under the DIP Facility. The Interim Lender's Charge shall not secure an obligation that exists before this Order is made.  The Interim Lender's Charge shall have the priority set out in paragraphs 41 and 43 hereof.

39.     Notwithstanding any other provision of this Order:

(a)     the Interim Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the Interim Lender's Charge or any of the Definitive Documents;

(b)     upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet), whether or not there is availability under the DIP Facility and notwithstanding any stay imposed under this Order: (i) without any notice to the Petitioners, the Petitioners shall have no right to receive any additional advances thereunder or other accommodation of credit from the Interim Lender except in the sole discretion of the Interim Lender; and (ii) the

Interim Lender may immediately terminate the DIP Facility and demand immediate payment of all obligations owing thereunder by providing such notice and demand to the Petitioners, with a copy to the Monitor;

(c)     with leave of this Court, sought on not less than three (3) business days' notice to the Petitioners and the Monitor after the occurrence and during the continuance of an Event of Default, the Interim Lender shall have the right to enforce the Interim Lender's Charge and to exercise all other rights and remedies in respect of the obligations owing under the DIP Facility and the Interim Lender's Charge; and

(d)     the foregoing rights and remedies of the Interim Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Petitioners or the Property.

40.     The Interim Lender, in such capacity, shall be treated as unaffected in any plan of arrangement or compromise filed by the Petitioners under the CCAA, or any proposal filed by the Petitioners under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

41.     The priorities of the Administration Charge, the Directors' Charge and the Interim Lender's Charge (collectively, the "Charges", as among them, shall be as follows:

First – Administration Charge (to the maximum amount of USD $250,000);

Second –  Interim Lender's Charge (to the maximum amount of USD $1,751,409.00 plus accrued and        unpaid interest, fees and expenses);

Third – Directors' Charge (to the maximum amount of USD $250,000).

42.     Any security documentation evidencing, or the filing, registration or perfection of, the Charges shall not be required, and that the Charges shall be effective as against the Property and

shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered or perfected subsequent to the Charges coming into existence, notwithstanding any failure to file, register or perfect any such Charges.

43.     Each of the Charges shall constitute a mortgage, hypothec, security interest, assignment by way of security and charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, mortgages, charges and encumbrances and claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**"), in favour of any Person, save and except those claims contemplated by section 11.8(8) of the CCAA.

44.     Except as otherwise expressly provided herein, or as may be approved by this Court, the Petitioners shall not grant or suffer to exist any Encumbrances over any Property that rank in priority to, or *pari passu* with the Charges, unless the Petitioners obtain the prior written consent of the Monitor, the Interim Lender and the beneficiaries of the Administration Charge and the Director's Charge.

45.     The Charges, the DIP Term Sheet and the Definitive Documents shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the Interim Lender shall not otherwise be limited or impaired in any way by: (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) or receivership order(s) issued pursuant to the BIA or otherwise, or any bankruptcy order or receivership order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, mortgage, security agreement, debenture, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Petitioners; and notwithstanding any provision to the contrary in any Agreement:

    (a)      neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the DIP Term Sheet or the Definitive Documents

shall create or be deemed to constitute a breach by any of the Petitioners of any Agreement to which any of the Petitioners is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Petitioners entering into the DIP Term Sheet, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)     the payments made by the Petitioners pursuant to this Order, the DIP Term Sheet or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

46.     Any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Petitioners' interest in such real property leases.

**SERVICE AND NOTICE**

47.     The Monitor shall:  (i) without delay, publish in *The Globe and Mail* (National Edition) a notice containing the information prescribed under the CCAA; and (ii) within five days after Order Date, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against the Petitioners of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

48.     The Petitioners and the Monitor are at liberty to serve this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Petitioners' creditors or other interested parties at their respective addresses as last shown on the

records of the Petitioners and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

49.    Any Person that wishes to be served with any application and other materials in these proceedings must deliver to the Monitor by way of ordinary mail, courier, personal delivery or electronic transmission a request to be added to a service list (the "**Service List**") to be maintained by the Monitor. The Monitor shall post and maintain an up to date form of the Service List on its website at: www.grantthornton.ca/BronMedia.

50.    Any party to these proceedings may serve any court materials in these proceedings by emailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, and the Monitor shall post a copy of all prescribed materials on its website at: www.grantthornton.ca/BronMedia.

51.    Notwithstanding paragraphs 48 and 50 of this Order, service of the Petition, the Notice of Hearing of Petition, any affidavits filed in support of the Petition and this Order shall be made on the Federal and British Columbia Crowns in accordance with the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, and regulations thereto, in respect of the Federal Crown, and the *Crown Proceeding Act*, R.S.B.C. 1996, c. 89, in respect of the British Columbia Crown.

**FOREIGN PROCEEDINGS**

52.    BRON Media Corp., or any of the Petitioners, are hereby authorized and empowered to act as the foreign representative (as applicable, the "**Foreign Representative**") in respect of these proceedings of the purpose of having these proceedings recognized in a foreign jurisdiction.

53.    The Foreign Representative is authorized to apply for foreign recognition of these proceedings, as necessary or advisable, in any jurisdiction outside of Canada including, without limitation, the United States pursuant to Chapter 15 of Title 11 of the United States Code 11 U.S.C., §§ 101 – 1532, the United Kingdom, Ireland and New Zealand.

**GENERAL**

54.     The Petitioners or the Monitor may from time to time apply to this Court for directions in the discharge of their powers and duties hereunder.

55.     Nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Petitioners, the Business or the Property.

56.     This Court requests the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any federal or State Court or administrative body in the United States of America, the United Kingdom, or any other foreign jurisdiction, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Foreign Representative, the Petitioners and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Foreign Representative in any foreign proceeding, or to assist the Foreign Representative, Petitioners and the Monitor and their respective agents in carrying out the terms of this Order.

57.     The Petitioners are hereby at liberty to apply for such further interim or interlocutory relief as it deems advisable within the time limited for Persons to file and serve Responses to the Petition.

58.     Leave is hereby granted to hear any application in these proceedings on two (2) clear days' notice after delivery to all parties on the Service List of such Notice of Application and all affidavits in support, subject to the Court in its discretion further abridging or extending the time for service.

59.     Any interested party (including the Petitioners, the Interim Lender and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days' notice to all

parties on the Service List and to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

60.     Eendorsement of this Order by counsel appearing on this application is hereby dispensed with.

61.     This Order and all of its provisions are effective as of 12:01 a.m. local Vancouver time on the Order Date.

THE FOLLOWING PARTIES APPROVE THE FORM OF THIS ORDER AND CONSENT TO EACH OF THE ORDERS, IF ANY, THAT ARE INDICATED ABOVE AS BEING BY CONSENT:

_____

Signature of
☐ Party   ☑ Lawyer for the Petitioners

_____

Asim Iqbal

_____

                                        BY THE COURT

                                        _____

                                        REGISTRAR

**Schedule "A"**

**List of Petitioners**

|     | **Debtor Company** | **Jurisdiction** |
| --- | --- | --- |
| **1.** | BRON Animation Inc. | British Columbia |
| **2.** | BRON Creative Corp. | Ontario |
| **3.** | BRON Developments Inc. | British Columbia |
| **4.** | BRON Media Corp. | British Columbia |
| **5.** | BRON Media Holdings Intl. Corp. | British Columbia |
| **6.** | BRON Media Holdings USA Inc. | British Columbia |
| **7.** | BRON Releasing Inc. | British Columbia |
| **8.** | BRON Studios Inc. | British Columbia |
| **9.** | BRON Ventures 1 (Canada) Corp | British Columbia |
| **10.** | BRON Everest Productions Inc. | Ontario |
| **11.** | Fables Productions BC Inc. | British Columbia |
| **12.** | Gossamer Productions BC Inc. | British Columbia |
| **13.** | Hench 2 BC Productions Inc. | British Columbia |
| **14.** | Henchmen Productions Inc. | British Columbia |
| **15.** | Robin Hood Digital PC BC  Inc. | British Columbia |
| **16.** | Windor Productions BC Inc. | British Columbia |
| **17.** | BRON Creative USA, Corp. | Nevada |
| **18.** | BRON Digital USA, LLC | Delaware |
| **19.** | BRON Life USA Inc.  (BRON Legacy USA Inc.) | Delaware |
| **20.** | BRON Media Holdings USA Corp. | Delaware |
| **21.** | BRON Releasing USA Inc. | Delaware |
| **22.** | BRON Studios USA Inc. | Nevada |

| 23. | BRON Ventures 1, LLC | Delaware |
|---|---|---|
| 24. | BRON Studios USA Developments Inc. | Nevada |
| 25. | Bakhorma, LLC | Washington |
| 26. | Drunk Parents, LLC | New York |
| 27. | Fables Holdings USA, LLC | Delaware |
| 28. | Fables Productions USA Inc | Delaware |
| 29. | Gossamer Holdings USA, LLC | Delaware |
| 30. | Gossamer Productions USA Inc. | Delaware |
| 31. | Harry Haft Productions, Inc. | New York |
| 32. | Heavyweight Holdings, LLC (previously Harry Haft Films, LLC) | Delaware |
| 33. | I Am Pink Productions, LLC | Delaware |
| 34. | Lucite Desk, LLC | Delaware |
| 35. | National Anthem Holdings, LLC (f. k. a. BCDC Holdings, LLC) | Delaware |
| 36. | National Anthem ProdCo Inc. | New Mexico |
| 37. | Oakland Pictures Holdings, LLC | Delaware |
| 38. | Pathway Productions, LLC | Delaware |
| 39. | Robin Hood Digital PC USA Inc. | Delaware |
| 40. | Robin Hood Digital USA, LLC | Delaware |
| 41. | Solitary Holdings USA, LLC | Delaware |
| 42. | Surrounded Holdings USA LLC | Delaware |
| 43. | Welcome to Me, LLC | California |

## **Schedule "B"**
### Non-Petitioner Entities

BRON Studios UK Ltd.
BRON Releasing UK Ltd.
CMA Productions UK Ltd.
In Good Company Holdings Ltd.
Kid Unknown Holdings Ltd (fka Hunaman Holdings Ltd.)
Neon Club Productions, Ltd.
Shadowplay Series Holdings UK Limited
TDBB Holdings UK Ltd.
Townsend Series Holdings UK Ltd.
Townsend Series Holdings UK Ltd.
Townsend Series Productions UK Ltd. (Grey Door Film Productions Ltd)
Front Runner Productions, Inc.
BRON Creative MG1, LLC
BRON Creative WB 1, LLC
BRON Labs LLC
A Single Shot Movie, LLLP
Blackhand Developments Inc.
Blackhand Pictures, LLC
BRON Next Film Production, LLC (BRON Life, LLC)
BRON Pictures Holdings, LLC
BRON Subnation Slate 1, LLC
Rideg Film Holdings, LLC
Brown Amy, LLC
Driftless Area, LLC
Drunk Parents Production Services Inc.
Erostratus LA, LLC
Erostratus, LLC
Fonzo Production Services Inc.
Fonzo, LLC
Front Runner, LLC
Green Moon Inc.

Schedule "C"

List of Counsel

## SCHEDULE "E"

## BORROWERS' ACCOUNT INFORMATION

See attached.



**INCOMING WIRE INSTRUCTIONS:**

**<u>DOMESTIC (U.S.):</u>**

**Bank Information:**

Wire Routing Transit Number:   121000248
Bank Name:                     Wells Fargo Bank
City, State:                   3101 Woburn St, Bellingham, WA 98226
Your Account Number:           ████████
Title of Account:              Bron Studios USA Inc

**Beneficiary Information:**

Name:       Bron Studios USA Inc
Address:    5542 Short Street
            Burnaby, BC, V5J 1L9

**<u>INTERNATIONAL:</u>**

**Bank Information:**

SWIFT Code:              WFBIUS6S
Bank Name:               Wells Fargo Bank
City, State:             3101 Woburn St, Bellingham, WA
Your Account Number:     ████████
Title of Account:        Bron Studios USA Inc

**Beneficiary Information:**

Name:       Bron Studios USA Inc
Address:    5542 Short Street
            Burnaby, BC, V5J 1L9

**ACH INSTRUCTIONS:**

Account:            Bron Studios USA Inc
Routing number:     125008547
Account number:     ████████

## SCHEDULE "F"

## TAXES AND SOURCE DEDUCTION

The last tax returns filed in respect of the Borrowers was on December 31, 2022. The Borrowers have not filed tax returns in 2023.

Amounts owing for source deductions: USD $687,001,

Amounts owing for EHT/WCB: CAD $98,000

## SCHEDULE "G"

## LITIGATION

All outstanding litigation proceedings set out in the Affidavit of Aaron Gilbert sworn July 18, 2023, a copy of which has been provided to the DIP Lender, including the proceedings set out below:

| *Premium Properties Limited et al v BRON Studios USA Inc. et al*; CV-18-00605972-0000 | | | | |
|---|---|---|---|---|
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| Premium Properties Limited | BRON Studios USA Inc. *et al* | September 27, 2018 | Ontario | ~$70 million |
| *Bell et al v BRON Capital Partners et al*; CV-21-00667577-0000 | | | | |
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| Bruce Bell and Evelyne Neiman | BRON Capital Partners *et al* | August 24, 2021 | Ontario | CAD $300,000 |
| *Living Trust Agreement U/A/D June 29, 1992, As Amended, by its Trustee, Dennis L. Weil v BRON Creative USA Corp.*; CV-23-00700890-000 | | | | |
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| Dennis L. Weil | BRON Creative USA Corp. | June 9, 2023 | Ontario | $750,000 |
| *Richardson et al v BRON Creative Corp. et al*; CV-22-00687032-0000 | | | | |
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| James Richardson<br>Nikink Holdings Ltd | BRON Creative Corp. *et al* | September 9, 2022 | Ontario | $1,500,000 |

| *Access Road Capital, LLC v BRON Ventures 1, LLC, BRON Ventures 1 (Canada) Corp., and BRON Media Holdings USA, Corp.*; Index no. 650841/2022 | | | | |
|---|---|---|---|---|
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| Access Road Capital, LLC | BRON Ventures 1, LLC<br><br>BRON Ventures 1 (Canada) Corp.<br><br>BRON Media Holdings USA, Corp | February 22, 2022 | New York, New York State | ~$12,000,000 |
| *Hudson Private LP v BRON Studios USA Inc.*; 7:21-cv-08259 | | | | |
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| Hudson Private LP | BRON Studios USA Inc.<br><br>BRON Creative USA Corp. | October 7, 2021 | Southern District of New York | ~$14.5 million |
| *Hudson Private Corp v BRON Creative USA Corp.*; CV-18-00605972-0000 | | | | |
| **Plaintiff(s)** | **Defendant(s)** | **Date Initiated** | **Jurisdiction** | **Amount of Claim** |
| Hudson Private Corp | BRON Creative USA Corp. | October 14, 2022 | New York | ~$7,000,000 |
| Big Block Capital Group, LLC[1] | BRON Ventures 1, LLC | | | $820,000 |

---

[1] The Borrowers have been made aware of the existence of this claim but have not yet been served with this claim.